[Crim. No. 7127. In Bank. Aug. 30, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN
ROBERT BRIGGS, Defendant and Appellant.

Russell E. Parsons for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

William B. McKesson, District Attorney (Los Angeles), Harry Wood, Robert J. Lord and Harry B. Sondheim, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

PETERS, J.—Defendant appeals from a judgment of conviction on two counts of attempted murder. That judgment included a denial of the motion for new trial. He was charged

in count I with attempting to kill his wife (Norma Briggs), and in count II with attempting to kill his wife's mother (Mary D. Nilson). The theory of the prosecution (based almost entirely on the testimony of Mrs. Nilson) was that defendant, with intent to kill the two women, deliberately caused the automobile in which they were seated to run over a cliff. The defense relied on the testimony of defendant and his wife that the occurrence was an unfortunate accident.

On and prior to July 20, 1959, defendant and his wife lived in the Pacific Palisades area of Los Angeles. They had been married for over 10 years, and had three children, aged 5, 8 and 9. Mrs. Nilson, who lived alone in the Wilshire area of the same community, was an overnight guest in the Briggs home on the night of July 19, 1959. On the morning of the 20th Mr. and Mrs. Briggs undertook to drive her home. Defendant drove the car, his wife sitting alongside of him, with Mrs. Nilson on the extreme right of the same seat. The car was a 1958 Mercury which belonged to Mrs. Nilson, but which she had left with the Briggs for the past several months because she did not care to drive it any longer. Mrs. Briggs was familiar with its operation, she having driven a duplicate of it for some time. It was equipped with automatic transmission, operated by push buttons situate on the dash in front of the driver, and was also equipped with power brakes. After leaving the house, Briggs drove to a service station where he had both the gas tank and a spare 5-gallon can filled with gasoline. He then drove into the Santa Monica hills, which were not on the direct route to Mrs. Nilson's home. At a point where the road ran along a canyon wall, he parked the car on the right-hand side of the road (closest to the downgrade side of the canyon), on the pavement, and parallel to the road; that is, in a normal parking position. He had stopped the car by simply removing his right foot from the accelerator pedal and depressing the emergency, or "parking" brake, with his left foot. (That brake remains engaged when the pedal has been depressed, and is released by means of a push button.) The motor was running, and the transmission was in "driving" position. With the car in such position and condition, Briggs said something about the motor overheating, pressed the button which released the hood, and got out.[1] He

---

[1]The hood was hinged at the front and opened upward, so that, when raised, it would not mask a person standing by the motor from the view of persons sitting in the front seat.

went to the front of the car and stood for a moment by the engine. While there he conversed with his wife regarding the heat gauge, and she advised him that it showed slightly above normal. There was some conversation between all three persons regarding the advisability of allowing the motor to cool with the engine running. After such conversation, Briggs returned to the door by the driver's seat. At this moment, and while Briggs was still outside, the car moved forward, turned to the right and went over the cliff. It came to a stop for some moments on a small ledge some 50 or 60 feet from the road, still in an upright position but with its front much lower than its rear. Then it tumbled the rest of the way to the bottom of the canyon.

The foregoing facts are uncontroverted. The rest of the testimony, regarding the movements of the three principal actors both before and after the occurrence, their relationship to one another, and motive or the lack thereof, was highly conflicting. As stated in respondent's brief: "In this extraordinary and fascinating case the crucial question . . . was the conflict between mother and daughter." The great discrepancy between the stories told by Mrs. Briggs and Mrs. Nilson, and the manner in which impeachment and rehabilitation of each was attempted, require a careful analysis of the testimony of each, not only as to the facts surrounding the alleged crime, but as to motive and opportunity for its commission.

No evidence was offered to contradict the defense testimony that there had never been any but a happy, normal connubial relationship between defendant and his wife. As evidence of motive, the prosecution attempted to show that if both Mrs. Nilson and Mrs. Briggs had died, Briggs would have inherited the considerable fortune owned by each, and also that he would have benefited by reason of recently obtained policies of life and accident insurance (totaling $600,000). That evidence was to the effect that when Mr. Nilson died (many years before the Briggs' marriage) the mother and daughter each inherited a very sizable fortune, some of which was distributed to each heir individually, while some was distributed in joint tenancy in order that Mrs. Nilson could manage the same for their joint benefit. As a result there was, on July 20, 1959, a considerable estate to which Briggs would normally succeed. But the legal situation was not normal. In the first place, immediately prior to his marriage Briggs (at the insistence of Mrs. Nilson) had executed a disclaimer of his right to

inherit, and that document was still in effect. Although that disclaimer would have no effect on property which his wife left to him by her will, it would have operated to bar him from succeeding in the absence of will. It was shown that Mrs. Nilson had often expressed the intention to so leave her property that Briggs could not obtain any interest therein. Since the prosecution failed to present any evidence that she had left anything to Briggs by will (or that if she had, that he knew the fact), it must be inferred that he had no reason to believe that he could obtain financial gain through the death of Mrs. Nilson, alone. On the other hand, it was shown that he and his wife had executed reciprocal wills, each leaving all of their respective estates to one another, and to their children if the spouse failed to survive the testator.[2] Of course, such wills would have rendered ineffectual the disclaimer that Briggs had executed insofar as his wife's considerable property was concerned. However, such fact does not necessarily lead to the conclusion that he would benefit financially from the will upon his wife's death, because the two had long before placed all of their property (community and separate alike) in joint tenancy, which property Briggs had managed ever since. It would therefore appear that Briggs had no need to do away with his wife in order to enjoy the fruits of her estate.[3] Furthermore, it is doubtful that the jury would or should find motive for murder in the fact, standing alone, that husband and wife had executed reciprocal wills. This is the ordinary custom of husband and wife. However, there was one peculiar circumstance concerning these wills. The evidence showed that the wills (both of which were holographic) had been executed only a short time before the alleged attempt, but had been predated by some six months. Mr. and Mrs. Briggs' explanation of the reason for predating was based on an alleged belief that dating prior to a pending divorce, among the Briggs' in-laws, would avoid claims from or by the divorcing parties. Such explanation was hardly convincing.

---

[2] The claimed error regarding the admission of these wills into evidence is disposed of near the end of this opinion.

[3] While Briggs' separate property did not compare in value with that of Mrs. Briggs, it is true that at the time of marriage he owned an interest in realty. Thereafter more realty was purchased with Mrs. Briggs' money, and Briggs developed, improved and sold those properties. It follows that even if all of the same had not been placed in joint tenancy, he would have had a considerable community interest in what became joint estate.

When viewed in light of motive, the evidence regarding the insurance was weak. The prosecution showed that shortly prior to the date in question Mr. and Mrs. Briggs had *applied* for four policies, consisting of one policy of 10-year-term life insurance in the sum of $300,000 on the life of each spouse, together with one accident policy (in which the death benefit was $300,000) in which each was the insured. However, the uncontradicted evidence was: (1) that such a program of insurance had been recommended to the Briggs by the accountant who handled their financial affairs, for the purpose of providing available cash to pay death taxes on the joint estate which was estimated at $1,000,000; (2) that the original plan was to obtain only the term life insurance, including double indemnity in the case of accidental death, and that the insurance broker found it necessary to make the applications in the form finally used in order to split the risk between two companies; (3) that the applications as presented (and the policies if issued would have) named the children as the sole beneficiaries, thus avoiding any inference that Briggs could obtain a direct financial benefit; (4) that two of the policies had never been issued, and that the other two had been issued only in the sense that they had been approved by the company, but such fact was unknown at the time to either Briggs or the broker, so that there was no evidence that Briggs had any reason to believe that the insurance was effective on the date of the alleged attempt. It should also be pointed out that there was documentary evidence, the testimony of independent witnesses, and of both Mr. and Mrs. Briggs, that the Briggs frequently went on hunting trips in which minor accidents could have been fatal, and engaged in water skiing and boating, etc., which made the application for accident insurance reasonably advisable.

In order to show intent, or a plan of action consistent with intent, the prosecution relied on two facts. These were the filling of the 5-gallon gasoline can, and the allegedly unexplained "detour" into the Santa Monica hills. As to the first, Mrs. Nilson merely recited the fact that Briggs brought the empty can with him and had it filled at the service station at the time of filling the tank of the car. There was no claim made that the car tank did not need filling, or that Briggs thereafter attempted to make any improper use of the can of gas. It was evidently the prosecution's theory that he would have done so had he had the opportunity. By way of rebuttal, both Mr. and Mrs. Briggs testified that the 5-gallon can had

been kept in their garage throughout the entire 10 years of their marriage, for the purposes of using the gasoline on their premises, and to fill any one of their three cars (passenger, station wagon or jeep) as the occasion demanded, and that it was customary for them to take it with them, if empty, on any trip to the gas station. This latter fact was corroborated by the service station attendants at the two stations which they had patronized over the years.

Regarding the alleged detour to the scene of the alleged attempt, Mrs. Nilson testified that when the family arose on the morning of the 20th she asked to be driven home; that both Mr. and Mrs. Briggs assented, but stated that they would first take her for a drive into the mountains; that she asked why they were going on this side trip, but was unable to receive an answer from either of them; that she protested the side trip during all of the journey. Both Mr. and Mrs. Briggs testified that it was their custom to spend a great deal of their time in the Santa Monica Mountains; that they often took trips to the vicinity of the alleged attempt, both for driving and hiking; that they often took their children there on picnics and hikes; that for many years they had been looking for acreage to use as a residence on which they could live and provide their children with horses and other incidents of country life not feasible in the Pacific Palisades; that the road they took was one of the approaches to the Boy Scout camp maintained by their church, and that Mr. Briggs (being on the Scout committee) desired to interest his mother-in-law in this property in order to solicit her financial aid in a building program; that at the dinner table, on the evening of the 19th, Mr. Briggs had advised the ladies that a real estate broker had told him of a piece of land in the area which was available, and that he thought that the three of them should drive up there on the next morning in order to look it over; that Mrs. Nilson was fully aware that the trip into the hills was for the varied purposes of looking for such property, showing her the country in which they were interested, and showing her the Scout camp; that although Mrs. Nilson asked to be taken home instead, she did not object strenuously when advised of the side trip. Mr. Briggs was unable to recall the name of the alleged realtor who had advised him of the available property, or to produce his card. He claimed that the man had been a stranger to him until he met him on the previous day, and that the business card on which he had made the notes had been in his shirt

pocket on the day of the accident, and was either lost at the scene, or taken by the police (who arrested him at the scene).

The manner in which the "accident" or "attempted murder" occurred was related solely by Mrs. Nilson, Mrs. Briggs, and the defendant, there being no other eyewitnesses. Mrs. Nilson testified that when Briggs first got out of the car he went to the front and did something with his hands in the vicinity of the motor; that he then returned to the door by the driver's seat, reached in and pushed some of the buttons, and the car started forward; that he then took hold of the wheel in an attempt to turn it to the right so that the car would go over the cliff; that his wife also grasped the wheel and struggled with him, but was unable to avoid the consummation of his purpose; that the car went over the edge, stopping some 60 feet down the face of the cliff, where Mrs. Briggs applied the power brakes; that neither she nor Mrs. Briggs received any wounds or injuries up to that point, although the descent was so steep that when she later got out of the car she was unable to stand or move, and had to hang on to the brush for three hours.

Mrs. Briggs testified that she could see Briggs' hands, and that he did not do anything to the engine; that as she was sitting in the center of the front seat, with her feet on the hump caused by the transmission housing, she (being over 6 feet tall) was off balance; that as her husband returned to the door of the car she was thrown off balance and slipped sideways to her right, causing her foot to depress the accelerator; that at this moment her husband reached in toward the operating buttons, but was unable to depress whatever he was reaching for by reason of the movement of the car; that the car "shot" forward; that in her panic she tried to raise herself from her fallen position by grasping the wheel and pulling herself up; that in doing so, she inadvertently turned the car to the right, and so over the cliff; that it "shot through the air," landing some 50 or 60 feet below on a narrow ledge which caused it to stop; that by this time she had been able to get her foot on the power brake which she had depressed to its fullest extent; that she noted that both she and her mother were bleeding, and thereupon she became unconscious.

Briggs' story was similar to that of his wife. He added that when the car commenced to move, he reached for and pushed at the "reverse" button, but was unable to depress it. He also stated that he tried to turn the wheel to the left (from his position outside) and being unable, he panicked and

attempted to hold the car back. by hooking his arm around the door post; that he was dragged to the edge and, as the car shot through the air in front of him he was able to see its entire underside; that he followed it through the air, landing approximately alongside of it.

A prosecution witness, qualified as an expert for the purpose of explaining the manner of operation of the car and its reaction to various stimuli, testified that in proper operating condition it would not move with the parking brake on, even though the engine was running and the transmission was in "drive" position, unless the engine was accelerated. He further explained that if the brake was released while in drive, without undue acceleration of the engine, the car would start forward at an ordinary speed, gathering momentum as the accelerator was applied, but that if sufficient excess acceleration was applied rapidly (that is, if the gas pedal was pushed all the way to the floor) while the parking brake was engaged, the car might shoot forward at a rapid rate at the moment the increased acceleration overcame the braking power. He also testified that if a person had sufficient mechanical knowledge, he could insert an object in the linkage where the connection from the accelerator pedal meets the carburetor, thus speeding up the engine without access to the gas pedal.[4]

A defense witness testified that he, as service man at the agency where Briggs had his cars serviced, had gone over the car shortly before the date in question, and had put everything, including the acceleration and the brakes, in order, and that

---

[4]The testimony of this witness did not assist the prosecution. If the prosecution was attempting to show that Briggs, when at the front of the car, tampered with the linkage so as to produce an accelerated speed of the engine, it showed no such fact. In the first place Mrs. Nilson (who owned and had been the previous driver of the car) did not testify to any "revving up" of the motor while Briggs was near the engine. Moreover, the police had the car in their exclusive possession from the moment of accident until the date of trial, and had experts go over it for several other reasons, but they offered no testimony that there had ever been tampering with the accelerator linkage. On the other hand, if the prosecution was attempting to show that Briggs returned to the door and pressed the button which released the parking brake, the evidence shows that the car would have started so slowly that Mrs. Briggs (the ordinary driver of the car) would have had ample time to turn off the motor, step on the power brake pedal, or merely steer the car from her position next to the empty driver's seat. In neither event could Briggs have relied on the chance that Mrs. Briggs might so slip in her seat that she would be unable to frustrate his attempt. On the contrary, the entire testimony regarding the operation of the car tends to support the defense contention that the car "shot" forward when the accidental application of gas, by Mrs. Briggs, overcame the braking power of the parking brake.

under the circumstances there should be no "creeping" with the parking brake engaged.

The testimony regarding the activities of each of the three participants after the car stopped for the first time is also highly conflicting. Mrs. Nilson testified that when the car came to a stop Briggs appeared at the door on the driver's side, shouting at his wife, "Why did you put your foot on the brake?" She further stated that he looked insane, with glazed eyes, and that he was shaking all over; that he thereupon attempted to push his wife's foot off the brake, and being unsuccessful in that attempt, went to the back of the car and obtained from the trunk[5] a blue rock which she identified as similar to those which she later found in a pile in his back yard.[6] According to her story, he then commenced beating Mrs. Briggs about the face and head with this rock, and when she (the witness) attempted to protect her daughter, he administered the same beating to her. It was these beatings with the rock, she claimed, which caused all of the injuries for which the two ladies were subsequently treated.[7] Mrs. Nilson testified that Briggs then disappeared, and that Mrs. Briggs, taking advantage of his absence, left the car and for some unexplained reason then ran or fell to the bottom of the canyon. At this point Mrs. Nilson claims to have held the car in position by moving over and placing her foot on the power brake. According to her testimony Briggs reappeared and continued in his attempt to beat her with the rock, but she was able to first remove and throw away his eyeglasses, and then obtain the rock which she threw out of the

---

[5]How any person could get into the rear trunk and obtain a loose object (which must have slid to the front) while the car was on a grade, established by the prosecution to have been almost a cliff, remains unexplained.

[6]The identification and admission of this rock is also subject to a claim of error which is disposed of near the end of this opinion.

[7]She denied all possibility that either was injured during the movement of the car off the road or during its first 60-foot descent. However, the doctors who treated the women (called by the prosecution) stated that the injuries could have been produced by any blunt instrument, including objects attached to the interior of the car. Neither was requested for an opinion as to the probable cause of the injuries. The police testified to the location of the blood stains in the car, in an attempt to create an inference that they were the result of a beating, but no attempt was made to qualify them, nor were they asked for an opinion regarding whether the stains indicated injury by beating or accident. On the contrary, a defense expert testified that, in his opinion, the pattern of stains was inconsistent with the splatter which would result from a beating about the face and head, but was consistent with injuries received by occupants of a car which moved as described above.

car window. After that Briggs sat on the car floor and kept asking for his wife. At some point each got out of the car, after which it plunged the rest of the way to the bottom. As Briggs kept asking for the whereabouts of Mrs. Briggs, she told him that the latter had gone up to the road. Thereupon he left, and she did not see him again until after her rescue. She was unable to move, but hung onto the cliff for three and a half hours by grasping the brush which grew there. She kept calling for help, and ultimately heard a man's voice. Neither party was able to see the other, because of the steepness of the cliff, but the man stated that he would go for help, and ultimately the police, ambulance and fire department arrived. She was rescued by means of a basket lowered down the cliff, and on reaching the road was interrogated by the police, to whom she made the charge of attempted murder. She was placed in an ambulance (in which Briggs already had been placed, tied to a stretcher) and the two of them were taken to the U.C.L.A. Medical Center. There she was treated and placed in a room with her daughter. The two remained overnight, and were released the next afternoon. She remained in her daughter's home until after the preliminary hearing.

Mrs. Briggs told a different story. She testified that when she became conscious the car was stopped on the ledge, and she had her foot on the power brake; that her husband appeared at the car door looking anything but calm (she corroborated her mother only in regard to Briggs' crazed appearance), but shouting at her to keep calm; that he first pushed the hood (which had remained up, thus blanking the driver's view) into closed position, and then slid into the driver's seat, stating that he would back the car up the cliff; that during all of this time her mother was shouting at her that Briggs was trying to kill them both, and that he had been beating them both with an iron bar;[8] that her mother was also telling her to run for her life; that these warnings and accusations continued during all of the time testified to, without cessation; that Briggs made no threatening movement

---

[8]That either or both women originally believed a beating to have been administered by a piece of iron rather than by a rock, is demonstrated by the hospital reports which are in evidence. The history taken by the admitting physicians includes such statement, and even though the same appears on each history, there is no indication that separate histories were taken from each. The notations could have been made after interrogating Mrs. Nilson, only, and the doctors were not asked which woman gave them the information.

toward either of them, nor did he attempt to push her foot from the brake; that on the contrary, he placed his foot on the brake beside hers (the power brake on such a car, which has no clutch pedal, is wide enough to accommodate several feet); that in spite of these facts, the witness testified that she became extremely frightened by reason of her husband's crazed appearance, by reason of her knowledge, as a driver, that no one could possibly back the car up the cliff, and by reason of her mother's repeated statements about a beating that must have taken place while she was unconscious; that because of such fear she could only think of getting out; that she managed to slide over to the open door, pushing her husband ahead of her, and thus out; that she thereupon ran, stumbled and fell to the bottom of the canyon where she hid herself under the brush and leaves. She did not believe that she was unconscious thereafter (although she may have been), but believed that she may have slept some of the time. She heard the car crash to the canyon bottom not far from where she lay. Ultimately help arrived in the form of one of the ambulance drivers, who gave her first aid and bandaged her wounds. A police officer also arrived. Her first concern was for her family, and on being assured that both were safe and at the road, she commenced to make her way up the cliff. The police officer, however, insisted on taking her out on a road at the bottom of the canyon, where she was placed in an ambulance and taken to the U.C.L.A. Medical Center, and ultimately put in a hospital room with her mother.

Briggs testified substantially as did his wife. However, he claimed recurring short periods of black-out or unconsciousness, and was unaware of the time or manner in which Mrs. Briggs left the car. He stated that he was anything but calm, both by reason of fear and by reason of injury as he fell down the cliff after the car. He claimed to have been acting in response to certain Red Cross training which he had received, and in which he had been admonished to attempt to create a calm atmosphere in moments of emergency. This was his explanation of his action in making believe that he could back the car up the cliff, although he knew that such was impossible. He testified that his actual intention was to merely hold the car in place for sufficient time to arrange the ladies' exit. He denied attacking either of the women. When he came to and found his wife gone, he continually asked her whereabouts from Mrs. Nilson, who at first gave him no reply,

and then told him that Norma had gone to the bathroom. He got Mrs. Nilson out of the car by the simple expedient of taking hold of her arm and pulling her out, whereupon she lay prone on the canyon wall. He continued to ask for the whereabouts of his wife, and then the car tumbled into the canyon. Mrs. Nilson asked him to go for help, so he left her and climbed to the road. It was his intention to get to the nearest house (approximately a mile and a half back toward town) to get help. Because he continued to black-out and come to, his progress was slow and impeded. Some of the time he walked, and some of the time he crawled, until he was found by an employee of the Rogers' Estate who was driving home along the same road. This party went for help and returned with another person. At that time he was found about a quarter of a mile closer to town, was prone on the road, unable to talk coherently, and drooling or foaming at the mouth.[9] On each occasion he asked for help to find his wife. He could think of nothing else but finding and saving Norma. An ambulance arrived, and he was placed in it, tied to the stretcher,[10] and driven to the scene of the accident. There he was interrogated by the police. Subsequently Mrs. Nilson was placed in the same ambulance with him, and a police officer entered. The officer and Mrs. Nilson conversed and Briggs attempted to interrupt to inquire about his wife. The officer admonished him to remain quiet, and not to interrupt. They were taken to the U.C.L.A. Medical Center, where he was physically examined. Then he was taken to the police station, booked and placed in jail.

The testimony of Mrs. Nilson was basic to the prosecution. To impeach her Mrs. Briggs testified to certain facts from which it can be inferred that her mother had a motive to secure the conviction of the defendant. In giving this evidence, it is reasonably inferable that Mrs. Briggs, because of the conflict between her duty to tell the truth (or help her husband, as the case may be) and her filial duty, attempted to state the facts in such a way as would soften the appearance

[9]It is the prosecution's theory that he was feigning injury, although the facts stated above were all corroborated by the prosecution witnesses who found him. The ambulance driver, who testified to the incoherence and the drooling, did not give an opinion, either way, as to the validity thereof. Although Briggs was examined at the hospital and said (by the police) to have suffered no injury, no medical report of such examination was produced.

[10]The ambulance attendant testified that this was for the patient's safety, and not for any other reason.

of attacking her mother's character. But the import of her testimony is clear. Mrs. Briggs was an only child, and her mother had not only attempted to keep the silver cord uncut, but had lived her life through her daughter. As a result she was firmly set against her daughter's marriage; she claimed that her antagonism was not to marriage itself, but toward Briggs, whom she denounced as a fortune hunter who wished to marry the daughter solely for her money; she refused to give her consent unless her daughter first deeded to her, outright, certain properties which they held in joint tenancy, placed in joint tenancy certain properties which were the daughter's separate estate, gave her a power of attorney, and signed blank stock powers. She also demanded, as prerequisite to her consent, that Briggs sign a disclaimer of all right to inherit, which she (Mrs. Nilson) caused to be prepared. Although she was 24 years of age, the daughter had spent her entire life without questioning her mother's will, and thus desired the latter's consent. As a result both she and Briggs consented to the mother's demands, and the marriage took place. Both during the marriage ceremonies, and for the 10 years which followed, Mrs. Nilson showed hatred of Briggs for taking her daughter from her. She expressed that hatred in many ways. She did everything in her power to get the daughter to return to her, even to the extent of offering a trip around the world (with Mrs. Nilson, of course) if she would leave her husband. She claimed that she had had Briggs investigated, and had sufficient information to send him to the penitentiary, although she refused to divulge what that information was. She consistently (for 10 years) advised her daughter not to go on hikes, hunting trips or on the water with her husband because the latter would use such opportunity to kill her for her money. Although Mrs. Briggs paid no attention to such talk, Mrs. Nilson repeatedly told her that some day Briggs would cause her "fiery death." Throughout the period of her marriage the daughter spent several days each week visiting with her mother, driving her on her business and shopping trips, but was unable to satisfy the latter's insatiable demands upon her time. Even though she spent the entire day with her mother, she was criticized for returning to her own home to prepare the evening meal for her own family. Her mother referred to her husband, without exception, in terms of reprobation, and for the 10 years of the marriage showed nothing but hostility toward him.

Mrs. Nilson took the stand on rebuttal and denied all of the

foregoing testimony. However, certain indisputable facts, including documentary evidence, corroborated Mrs. Briggs' testimony in its fundamental inference that Mrs. Nilson desired to see Briggs in the penitentiary. An example appears in Mrs. Briggs' testimony that at her wedding reception Mrs. Nilson dramatically stopped the grandfather's clock, which stood in the front hallway of her home, stating that since her life stopped at that moment the clock would run no more. Mrs. Nilson denied making that statement, but, since witnesses were aware of the act, she explained that her reason for stopping the clock was that it made too much noise. She was unable to deny that it had always been allowed to operate previously, had not been started again in the 10 years which followed, or that any attempt had been made to repair it. The deeds, stock powers and power of attorney she was, of course, unable to deny, but attempted to explain her demand for them as necessary for the purpose of managing the properties while her daughter was absent on her honeymoon. Such attempted explanation must be judged in light of the recorded documents which show (a) that she did not reconvey the realty thereafter, and (b) that when (on her return from her honeymoon) Mrs. Briggs revoked the power of attorney, her mother demanded and received a duplicate which was not thereafter revoked. Although Mrs. Nilson denied having harbored any resentment toward Briggs, she was required to admit the authenticity of a letter (written long before the events at issue herein, and found by Mrs. Briggs in the glove compartment of the car which Mrs. Nilson had turned over to her) addressed by Mrs. Nilson to the police or whoever might find her in case of death or accident, and in which she stated that she had no relatives or any other person who could make final arrangements for her. Although Mrs. Nilson denied all attempts to affect her daughter's testimony prior to the preliminary hearing, or to control the manner of presentation of evidence at the trial itself, she produced little, if any, explanation of several outlines of proposed testimony which she typed in duplicate and sent (unsolicited) to her daughter and to the various prosecuting attorneys who were assigned to handle the case. Still another impeaching factor is found in the fact that the written records (relied on by the prosecution) indicate that when Mrs. Nilson first complained to the police she claimed that Briggs had attacked them with a pickax; that when the police searched and found no such weapon they suggested (and she adopted the story) that the beating was

administered with a tire iron; that by the date of the prelimi-
nary hearing she had changed the weapon to a grey rock, and
at the trial identified and claimed that the beating was admin-
istered with a blue rock.[11] But the most important document
of all—a diary admittedly kept by Mrs. Nilson, and which not
only corroborates Mrs. Briggs' testimony of bias and hate
for Briggs, but gives the direct lie to many of Mrs. Nilson's
disclaimers—was identified only, and not received in evidence.
The propriety or impropriety of reviewing this diary on ap-
peal will be discussed in connection with the sufficiency of
the evidence.

Damaging impeachment of Mrs. Briggs consisted of showing
that at the preliminary hearing she had testified that Briggs
had beaten the two women about the face and head when the car
was at its first point of rest. (Otherwise her testimony at the
preliminary hearing, including her explanation of the manner
in which the accident occurred, was consistent with her testi-
mony at the trial.) The inference that she was, at the moment,
afraid of her husband, was also bolstered by her admission
that she hid herself at the bottom of the canyon after leaving
the car. In an attempt to rehabilitate herself, Mrs. Briggs
explained that when she first regained consciousness and saw
her mother and herself covered with blood, and heard her
mother screaming that someone was trying to kill them, and
had been beating them with a tire iron, and admonishing her
to run for her life, she ran and hid in panic; that from the
moment she was placed with her mother at the hospital until
the moment of their release, Mrs. Nilson continuously kept
stating that Briggs had beaten the two of them in an attempt
to kill them both; that after their release, and during the
time that Mrs. Nilson stayed at the Briggs' home, her mother
continued such statements, never giving the daughter any
peace or relief from her harangue; that because in her entire
life she had been under her mother's domination, never having
doubted her word or questioned her authority, she at length
came to believe that such a beating must have been adminis-
tered; that it was only when her mother, during this period,
walked to the Briggs' rock pile and picked up a rock, stating

[11]Her dilemma, and the necessity for changing her story, is to be found
in the fact that neither pickax, tire iron nor rock of a size capable of
being used as a weapon was ever found. The hillside at the scene consisted
entirely of small, loose shale. The rock subsequently identified was
obtained by Mrs. Nilson (after the fact) from a rock pile in the Briggs'
yard.

that this was the source of Briggs' weapon, and that he must have brought it with him for the purpose of murder, did she commence to have grave doubts of her mother's statements; that she thereupon attempted to point out to her mother that she was in error, and was advised that if she (Mrs. Briggs) testified otherwise she would be committing perjury, for which the penalty was imprisonment;[12] that the preliminary hearing was held within the next few days; that she was ill, confined to her bed, and only arose and attended that hearing because the judge had stated that he would otherwise hold court at her bedside, and she wished to avoid exposing her children to such a scene; that as a result she testified at the preliminary hearing while still ill and under the domination of her mother, and believing that her mother knew facts unknown to her; that as to the facts which she knew of her own knowledge, she testified truthfully at the preliminary hearing; that it was only after that hearing, when she and her mother came to a parting of the ways regarding their testimony, and she was left alone to think things out for herself, that she realized the absolute error inherent in her mother's recapitulation of the alleged beatings; that on coming to the realization of the truth, she so advised the prosecuting attorney. She was positive in her testimony that both she and her mother were injured and bleeding when the car first stopped at the 60-foot point.

Mrs. Nilson testified to an incident which, she claimed, occurred at her house between the dates of the preliminary hearing and the trial. According to her version, Mrs. Briggs was despondent because she had decided to perjure herself in order to save her husband. She testified that on a specific date and occasion Mrs. Briggs discussed this fact with her, and, taking a knife from the kitchen drawer, threatened to kill herself. The defense rebutted this story by producing a business associate of Mrs. Nilson (a tenant, with whom both women were arranging the details of building new premises on a piece of joint tenancy property). According to his testimony, he was present in Mrs. Nilson's kitchen for the entire period assigned by Mrs. Nilson to this incident, having arrived before and staying later than Mrs. Briggs. He completely denied the story told by Mrs. Nilson (including the suicide threat), and corroborated Mrs. Briggs in her statement that

[12]Although Mrs. Nilson denied making any such threat, the language of one of her unsolicited reports to the prosecuting attorney indicates that she did have some such thought in mind. So does the diary.

an argument arose between the two women only because Mrs. Briggs denied that Briggs had ever, at any time in her life, laid violent hands upon her.

Another effort to discredit Mrs. Briggs' attempted rehabilitation was made by interrogating her regarding inconsistent statements which she was supposed to have made to the police and ambulance drivers at the time she was rescued from the bottom of the canyon, and subsequently in the hospital. Each such alleged statement was read to her from an unidentified document. When she denied having made each and every·such statement, the various police officers and ambulance attendants were called. Each testified that Mrs. Briggs made to them, in July of 1959, certain statements which the prosecuting attorney purported to be reading to them *in haec verba* from written reports in his possession, but which "reports" were subsequently determined to be documents which the respective witnesses prepared at the district attorney's request after commencement of trial, and after at least one such witness had had the opportunity of hearing Mrs. Briggs' testimony at the trial.[13] The jury was not advised completely of the true nature of the source of such examination. The problem raised by these facts will be discussed toward the end of this opinion.

 Appellant's first contention is that the evidence was insufficient to support the verdict. Such contention, standing alone, would warrant reversal only if there is no evidence as to some essential portion of the charge, or if the evidence as to some such portion is so improbable as to be unworthy of belief by a reasonable person. The record here will not support either such claim. Mrs. Nilson testified to facts which, if accepted by the jury, contained every essential element of the charge. If her story had gone unchallenged there could have been no claim of insufficiency of the evidence. By way of rebuttal the defense offered evidence tending to cast doubt on practically every portion of her testimony, but such impeachment went only to the weight to be given to the evidence, and it was for the jury to accept or reject the original story or the impeachment. It is also true that the evidence which the defense offered in support of its explanation of an accident would, if accepted by the jury, have been sufficient to sustain

---

[13]This statement is true of all such witnesses with the single exception of the newspaper photographer who took Mrs. Briggs' picture at the scene.

a defense verdict. But the jury chose to disregard the defense explanation and to accept Mrs. Nilson's statement of the facts at their face value. This it was entitled to do. Since it cannot be said that the prosecution's version of the facts was so improbable as to be entirely unworthy of belief, an appellate court may not substitute its determination for that of the jury. The latter is the legally constituted finder of fact. We must, therefore, conclude that the evidence was sufficient to sustain the verdict.

Such conclusion, however, requires further comment on the evidence. The jury was required, in order to reach a verdict, to reject the testimony produced by the defense and to accept that produced by the prosecution. In such a situation it is apparent that anything which tended to discredit the defense witnesses in the eyes of the jury, or to bolster the story told by Mrs. Nilson, assumed an importance which would not be attributable to it in an ordinary situation. Thus, even though the evidence was sufficient to sustain the verdict, its nature was such as requires close scrutiny when determining the prejudicial nature of any error.

In construing the constitutional admonition against reversal in the absence of miscarriage of justice (Cal. Const., art. VI, §4½) it has been held that reversal is proper only when, after reviewing the entire record, including the evidence (*People* v. *Woods,* 190 Cal. 513 [213 P. 951]) it appears reasonably probable that a result more favorable to the appealing party would have been reached in the absence of errors which were properly preserved in the court below (*People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243]). In the instant case, the jury was not only faced with the mentioned contradictions in the testimony of the opposing parties, and with the various attempts to impeach and rehabilitate both sides, but it also had knowledge of a situation which must have required it to ponder at great length before rejecting Mrs. Briggs' testimony that the occurrence was the result of an accident. Inherent in Mrs. Nilson's version is the fact that if the same was true, then Mrs. Briggs, of course, knew it to be true. Regardless of any assumed desire on the part of the wife to come to the defense of her husband, it must have been hard for the jury to believe that a woman who knew that her husband had tried to kill her would subsequently employ every effort to secure his acquittal. Fear for herself and for her children would militate against such action. If the prosecution's theory was to be accepted (as it was), Briggs

could only benefit financially upon the death of his mother-in-law, his wife, and all of his children. Since this fact was also known to Mrs. Briggs, the jury must have realized the grave danger in which she was placing herself and her children if she knowingly gave false testimony on behalf of the defendant. There was also the testimony (of both Mrs. Briggs and Mrs. Nilson) that from the very first day after their release from the hospital the two ladies had grave arguments over the daughter's public attitude toward her husband. The mother constantly criticized her daughter for visiting Briggs in jail, for greeting him affectionately at the arraignment, and for doing likewise at the preliminary hearing. These facts were undenied. Thus the jury had before it some very specific evidence of the fact that, from the beginning, Mrs. Briggs' attitude toward her husband was one which indicated her entire belief in his innocence.[14] It would have been understandable had they accepted her testimony and rejected that of Mrs. Nilson. Because they took the opposite course, we must assume that the evidence which tended to impeach the defense theory or to bolster that of the prosecution had relatively great importance in the eyes of the jurors. If any such evidence was admitted erroneously, it must be held to have been prejudicial, for without such it appears reasonably probable that a result more favorable to defendant would have been reached.

The appellant contends that in determining the sufficiency of the evidence this court should consider the diary of Mrs. Nilson which was introduced into evidence for identification only. Although we have come to the conclusion that such diary may not be considered on this appeal, we note that if it had been properly offered and admitted it would constitute evidence of utmost significance to the defense, and most certainly would have added to the great weight of material which tended to bolster the defense witnesses and discredit

---

[14] In addition to such evidence which was before the jury, Mrs. Briggs' belief in her husband's innocence is also supported by other matters of record. She was instrumental in and spent large sums of money obtaining Briggs' release on bail pending the trial, and accompanied him on a vacation trip to Florida during that period. She similarly spent her funds and efforts obtaining his release on bail pending appeal. When such was terminated she was the moving party who obtained bail in this court by means of an affidavit that she and the children needed his presence for their protection. She thus treated him as a husband and father, and not as a person who had tried to kill her, and who was likely to kill her children.

Mrs. Nilson.[15] The facts concerning the introduction of the diary are relatively simple. Mrs. Nilson had testified to the occurrence of a corollary matter. Subsequent testimony tended to impeach her as to the date of this occurrence. In order to rehabilitate herself she later took the stand and corroborated the dates from her dairy. The particular page from which she read was shown to counsel for the defendant, and then the diary was properly offered for identification by counsel for the prosecution. Whether defendant's counsel overlooked it in the heat of trial, or did not realize its significance, it was not read, and never offered as evidence. Nor was it made a basis for the motion for new trial subsequently made and denied. New counsel, substituted for the purpose

---

[15]Although Mrs. Nilson denied under oath that she hated Briggs, in her diary she reviled him and referred to him in the lowest of terms. The diary is full of expressions of hatred for her son-in-law. It discloses no specific basis for such hatred other than the fact that Briggs had taken her daughter from her, and that he was enjoying the use of the money that ''my family made.'' It reveals the writer as a woman who believed that she had lost her daughter's love and would go to any extent to regain that lost relationship. It reveals her as a mother who made insatiable demands upon her daughter's time, and who was completely unaware that she was receiving far more of it than most married women devote to even a demanding mother. It is replete with examples which indicate her complete domination over her daughter. It also corroborates Mrs. Briggs' testimony that it was not until after the preliminary hearing that she, Mrs. Briggs, commenced to answer or criticize her mother's attempts to dominate her and her testimony. The diary voices suspicion of every person mentioned in it, including her daughter, without any indication of a reason or basis therefor. The diary makes the unintended revelation that the mother lived no life of her own except through her daughter. Throughout the more than one year covered by the diary, the daughter's calls, visits and activities are detailed in minutiae on three pages out of four, without any indication that Mrs. Nilson was ever visited by or received a telephone call from any other person who was not an employee or business contact. Her typical day was spent reviewing the stock market quotations, watching TV, attending to rentals, talking to her daughter on the telephone, or waiting for the latter to call or come over. When the daughter arrived, the day was spent going to the bank, shopping, to lunch, to the beauty parlor, or attending to rentals. There is not a single mention of a visit to (or even the name of) a friend. On Christmas day (after the trial which caused mother and daughter to break off their relationship) Mrs. Nilson prepared a Christmas dinner and ate it alone. No one telephoned or came to the house.

The diary includes many items in which Mrs. Nilson's own words rebut important points in her testimony. For example, she had denied, on the stand, her daughter's accusations that for years her mother had stated her opinion that Briggs would kill her, or send her to a ''fiery death.'' The diary reveals that after the date of the alleged crime, and months before the trial, she believed her daughter to be angry with her because all of her warnings became true.

In essence, the diary not only shows positive motive for obtaining Briggs' conviction, it also contains material which casts grave, doubt on the credibility and mental condition of the prosecution's chief witness.

of this appeal, read it and found it to be corroborative of Mrs. Briggs' testimony regarding her mother. He moved the District Court of Appeal to augment the record in order to include the diary. Such motion was properly denied because a motion to augment is addressed only to material which is then "on file in or lodged with the superior court" (Cal. Rules of Court, rule 12(a)*), whereas the diary was already before the appellate court as a portion of the record. What counsel was really attempting was to have the court consider the diary as if it had been offered in evidence. Since it was not so offered, it was not considered by the jury. For that reason we may not consider it as evidence which might have affected the deliberations of that body. But since this case will have to be tried again for other reasons, we note that the diary is now available for impeachment purposes.

From this review of the evidence, it is our conclusion that although it is sufficient to sustain the two jury verdicts, it is so close (without consideration of the diary), that any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial.

Appellant contends that the trial court erred in admitting into evidence certain statements and declarations made by Mrs. Nilson at the scene of the alleged crime, and certain unanswered questions posed by the arresting officers, all over the objection of defendant. Respondent argues that such evidence was admissible as accusatory statements, made in the presence of defendant, to which he failed to respond. Respondent also contends that the point may not be raised on appeal for the reason that defendant did not follow up his objection when the trial court failed to rule on it.

The record shows that defendant was picked up from the road in a questionable mental and physical condition. He was drooling and incoherent. Although it was the prosecution's theory that this condition was feigned, the ambulance attendants who found him refused to state any opinion thereon, and the prosecution failed to call the doctors who first examined him. The ambulance attendants first questioned Briggs as to whether he had done anything wrong, and he made a blanket denial. They then tied him to the stretcher, for protection, placed him in the ambulance, and drove him to the scene of the accident. At that point, and while he was in the ambulance, with the door open, Mrs. Nilson was brought

*Formerly Rules on Appeal, rule 12(a).

up the cliff and conversed with the police officers. That conversation, most of which took place outside the ambulance, consisted of Mrs. Nilson's various statements that Briggs had tried to murder her and her daughter. She and one officer subsequently got into the ambulance with Briggs. Mrs. Nilson continued her accusations, but the entire conversation was between her and the police officer, and none of it was directed to Briggs. At one point Briggs attempted to interrupt the conversation by asking for information of his wife, and was told by the officer (according to the admission of the prosecution) to remain silent. Subsequently, and while another officer was driving defendant from jail to the police station (an arrest having been consummated) he asked Briggs if he had tried to kill the women, and received no reply.

At the trial, prosecution witnesses were allowed to testify to the verbatim accusations made by Mrs. Nilson, as well as to the unanswered question subsequently asked of Briggs, all on the theory that his failure to reply was evidence of guilt. The prosecution does not deny that the testimony in question was hearsay, and thus not admissible unless it came within the exception of undenied accusatory statement. The circumstances related above indicate that this particular testimony should not have been admitted as such an exception, at least without some showing that the defendant heard, understood, had an opportunity to deny, and was in a position wherein he was called upon to make a denial.

The exception to the hearsay rule is founded upon the proposition that the failure to deny under proper circumstances indicates a consciousness of guilt (19 Cal.Jur.2d, Evidence, § 401, pp. 141 et seq.). But where there is some doubt as to whether the defendant was in a position to hear the statements, understand them, or make reply, the question of whether his failure to respond gave rise to an inference of acquiescence or guilty conscience is a matter for the trial court to determine, before admitting the testimony (*idem*, p. 143; see also *People* v. *Davis*, 43 Cal.2d 661, 670 [276 P.2d 801]; *People* v. *Yeager*, 194 Cal. 452, 487 [229 P. 40]). Here, defendant called this very fact to the attention of the court by his objection in which he stated that there was no showing that he had either heard or understood Mrs. Nilson's statements, but the court did not take any evidence then or at all on that subject before admitting the hearsay. Even if we accept the prosecution's unproved theory that defendant was feigning his mental and physical condition,

that is not a showing that he heard the portion of the conversation which took place outside of the ambulance, or was listening to that portion which took place inside but was addressed to a person other than himself.

Furthermore, the hearsay statements may not be admitted under any guise if the circumstances indicate that defendant was not entirely free to reply if he chose to do so, or that his silence was attributable to the exercise of his constitutional privilege against self-incrimination (19 Cal.Jur.2d, *supra,* pp. 141-142). Here defendant was not only under the custodial restraint of the police, but he had already been told that he was suspected of crime, *and he had been told by the officer to keep quiet* when he attempted to interrupt. For this reason, alone, the so-called accusatory statements should not have been admitted.

Some legal scholars have questioned the propriety of admitting undenied accusatory statements made while the defendant is in custody, for the reason that, in such a case, the so-called admission is not free or voluntary, and that the failure to deny while in custody, while it may indicate an abnormal state of mind, does not necessarily indicate a guilty frame of mind. (See *Admissibility of Accusatory Statements as Adoptive Admissions When Defendant Is Under Arrest,* 35 Cal. L. Rev. 128.) California, it is true, permits the introduction of such evidence when it is shown that defendant heard, understood, and had an opportunity to deny, but it has not permitted the unrestricted use of such evidence (*People* v. *Simmons,* 28 Cal. 2d 699, 712-721 [172 P.2d 18]). In the *Simmons* case, after holding the admission of such statements was error, this court did not reverse because the defendant's voluntary confession made the error nonprejudicial. But in the next year, in *People* v. *Bob,* 29 Cal.2d 321 [175 P.2d 12], the court followed the rule of the *Simmons* case, this time reversing. In the instant case, the fact that the defendant was told to keep quiet is much more persuasive than any factor discussed in the *Bob* case.

The contention that this point should not be considered by this court because defendant failed to follow up his objection is untenable. The record shows that counsel first objected when the officer commenced his testimony by relating the statements which Mrs. Briggs was said to have made outside of the ambulance. The stated ground of the objection was that "Mr. Briggs wasn't present." This amounted to objecting on the ground that the evidence was hearsay, and that there had been no showing warranting an exception to the

hearsay rule. Rather than ruling on that objection, the court interrupted counsel by inquiring of the witness as to what Mrs. Nilson said next. Later, after the court had admitted the balance of the alleged "accusatory statements," defendant's counsel moved "that it go out." Again the judge's only reaction was to ask the witness to repeat what Mrs. Nilson had said. Even if it be assumed that the trial judge did not hear either the objection or the motion, the phonographic reporter heard them, and so (we must assume) did the jury. The importance of the objection was obviously minimized in the jurors' minds by reason of the judge's failure to act thereon. Regardless of that fact, the jury heard the evidence as well as all arguments predicated thereon.

We are urged by respondent to hold that the point under discussion may not be now considered not only because defendant failed to make the proper objection in the first instance, but further because he failed to press his objection when the court failed to rule. Because of the intentional or inadvertent actions of the trial judge there was no opportunity to enlarge on either the objection or the motion to strike. Even if, contrary to the fact, the objection was not properly phrased, and even if it was not stated in the most precise terms, "[w]e do not feel inclined to deprive defendant of his right to .... be tried with competent evidence because of the oversight of his counsel in the midst of a difficult trial to remember that he should add the word, hearsay, to the statement of his objection." (*People* v. *Darby*, 64 Cal.App.2d 25, 33 [148 P.2d 28]; *People* v. *Bob, supra,* 29 Cal.2d 321.) Nor do we feel inclined to require more than one objection and one motion to strike when counsel has been ignored (inadvertently or otherwise) on two occasions. The situation is analogous to that where counsel is excused from making further offer of proof when the court has once indicated its refusal to receive a general class of evidence (*Costa* v. *Regents of University of California,* 116 Cal.App.2d 445, 465 [254 P.2d 85]).

For these reasons, and without passing on the question of whether defendant's general denial of any wrongdoing made before the accusations were uttered, made further denial unnecessary, the admission of the accusations was error. The error was prejudicial for the reason that the erroneous admission of these accusations obviously tended to discredit defendant and to bolster the testimony of Mrs. Nilson. In view of the closeness of the evidence it is at least reasonably probable

that had this evidence not been admitted a different verdict would have been rendered. Thus, a reversal is necessary.

There are certain other matters that may arise on the new trial and for that reason should be discussed.

Appellant contends that the trial court erred in allowing the prosecution to cross-examine Mrs. Briggs, and subsequently to examine its own witnesses, from documents which the prosecuting attorney obtained from certain of his witnesses after the commencement of trial, and which appeared to be (but were not) reports made prior to trial and at the time that each of such witnesses had a conversation with Mrs. Briggs. Unfortunately, trial counsel confined her objection, and counsel on appeal similarly confines his argument, solely to a question of discovery, and neither calls attention to the real error involved. ▮ It appears that prior to trial defendant had requested inspection of all reports and written documents in the possession of the prosecution. The court had made an order granting such request, and there is no claim that the prosecution failed to comply. When, at the trial, it became apparent that the prosecuting attorney was reading from a document which defense counsel had not seen, there was an immediate objection followed by discussion, argument and the presentation of evidence on the point, all in chambers. These discussions in chambers were continued, or were repeated, over several days, each time a new document was disclosed. It was there shown that when the prosecution first examined the police and the ambulance attendant as prosecution witnesses it was in possession of various police reports which had been submitted to defendant for inspection, and which contained information in summary form, only, and which did not indicate that Mrs. Briggs was the source of any of that information. At that time there had been no written memoranda made by any of the witnesses purporting to be a *haec verba* record of any conversation with Mrs. Briggs. But, after Mrs. Briggs had testified, the district attorney discussed her testimony with his witnesses in order to prepare for rebuttal, and discovered that they had no written reports of their conversations with Mrs. Briggs either at the scene or at the hospital. He thereupon requested them (at that later date) to make written reports to him, setting forth those conversations. Although those ''reports,'' made seven months after the conversations, were perused by the court and both counsel in chambers, they were not identified or placed in evidence, so they are not in the record. But the way they were used by the

prosecution in questioning each witness makes it obvious that the documents were in the form of questions supposedly asked of Mrs. Briggs, and answers supposedly given by her to the respective witnesses.

In reference to these "reports," defendant's counsel took the position that the original order requiring inspection of documents took on the nature of a "continuing" order, and that therefore the prosecution was bound to have delivered copies, or to have allowed inspection, when the same first came into its hands (which, in each case, was several days prior to use of the document in court). The court ruled, properly, that the original order was not a continuing one, and that the prosecution fulfilled its duty when it allowed inspection of all documents then in its possession. No one having argued any other phase of the matter, the court then required the prosecution to make disclosure, in chambers, and then allowed the examinations to continue in the manner stated above. Counsel for appellant now argues that the case law regarding discovery on behalf of a defendant in a criminal case will be entirely frustrated if this practice is to be condoned. It is pointed out that a prosecutor may escape the burdens of discovery by the simple expedient of advising the police to make no written reports until after the commencement of trial. Any merit which there may be in such an argument is negated where the prosecutor is merely attempting to obtain from his own witnesses some additional material to be used by him in the actual trial. ▌ No authority has been produced which supports a claim that an attorney (prosecutor or otherwise) must subject to inspection each note he gives to or receives from a witness during trial. Such would be tantamount to requiring him to maintain his trial file open for inspection at all times. That is not the law.

The manner in which the documents were used, as distinct from the fact that they were used, created a situation which might have constituted serious error had it been called to the attention of the trial court by timely objection. In examining both Mrs. Briggs and his own witnesses the prosecuting attorney phrased each question by reading to the witnesses directly from the recently prepared documents, as if he held in his hand a transcript of a conversation which had taken place some seven months previously and purportedly transcribed at that time. In that manner he read, *in haec verba,* a question purportedly asked of Mrs. Briggs together with an answer purportedly given by her, and then asked the witness if such

question had been asked and such answer given. He did not show the witness the document from which he was reading, nor did he explain that it was a recently prepared summary of a witness's recollection, prepared in the form of a transcript of questions and answers.

In examining Mrs. Briggs, there is no doubt that the prosecution was entitled to ask her if she had given specific answers to specific questions during specified extrajudicial conversations, for the purpose of showing inconsistency with the testimony she had given at the trial. Such is required as foundation before she might be impeached by calling the other parties to the conversation as witnesses (Code Civ. Proc., § 2052; *People* v. *McCoy*, 25 Cal.2d 177 [153 P.2d 315]). And since the purported transcript of such conversation had never been seen, corrected or signed by her, it was not a document which the examining attorney was required to first show to the witness under the provisions of the code (Code Civ. Proc., §§ 2052 and 2054), and the examiner was entitled to refer to it for the purpose of refreshing his memory in framing his questions (*People* v. *Singh*, 136 Cal.App. 233, 243 [28 P.2d 416] ; *People* v. *Haughey*, 79 Cal.App. 541, 544 [250 P. 406]). But by reading from the documents *in haec verba*, as he did here, the prosecuting attorney created the impression that he was reading from an authentic and identifiable transcript of a conversation made at the time that conversation took place. He made no attempt to explain to the jury that this was not the case, or that such a transcript (if it had existed) was not of itself evidence and could only be used to lay the foundation for the impeachment of Mrs. Briggs by subsequent testimony of the other party to the conversation (*People* v. *Haughey, supra*). Of course, the prosecuting attorney was under no duty to make such an explanation in the absence of any suggestion from defense counsel, but his failure to do so, when considered in light of his knowledge of the true nature of the document, most certainly gave the jury an erroneous impression of fact.

Much more serious was the use of the documents, in the same manner, during the examination of each of the impeaching witnesses. Relating the purported conversation *in haec verba* and then asking if it took place, was not required to lay a foundation, as in the case of the examination of the witness to be impeached. Such procedure was not predicated on any showing that the witness required that his recollection be refreshed. Furthermore, if such had been the case, the manner in which recollection may be refreshed is set forth in Code of

Civil Procedure section 2047 which requires that the document be shown to the witness, identified by him, and that before he testifies from it the opponent be allowed to cross-examine him in regard to it. If such procedure had been followed, it would have immediately been made apparent to the jury that the prosecution witnesses had not made a transcript of the purported conversations when they were allegedly held, that what purported to be a transcript was merely the result of each witness's effort to reconstruct those conversations some seven months later (after hearing Mrs. Briggs' testimony), and that the notes on which the witness relied for the purpose of reconstructing the alleged conversations did not even indicate that such a conversation had taken place. Under the proper procedure the jury would have been able to give to the impeaching testimony the weight which it deserved, instead of that weight to which it appeared to be entitled.

There is no question that the documents themselves could not be introduced into evidence, nor would they constitute evidence that the conversations had taken place, even if they had been the original transcripts which they appeared to be. (*In re Flint,* 100 Cal. 391, 399-400 [34 P. 863].) While there was no attempt here to introduce the documents, the manner in which they were used was singularly effective in leading the jury to believe that they were original transcripts of a disputed conversation. Neither the need for refreshing past recollection (if it truly existed), nor any other requirement which might otherwise form the basis for the use of a witness's transcribed notes, should be used as a cover to give the jury a false impression of the weight to which any testimony is entitled.

However, the problems last mentioned were not raised by appellant, and so may not be considered as error on this appeal. But, because of the necessity of another trial, for other reasons, a discussion of them has been included in this opinion so that on such retrial the possibility of error will be avoided.

Appellant also contends that he was denied a fair trial by reason of several alleged errors concerning: (1) the form of the indictment; (2) the manner in which he withdrew his plea of not guilty by reason of insanity; (3) introduction of a rock for the purpose of illustration; (4) the allegedly privileged nature of the two wills which the prosecution was allowed to introduce; and, (5) the taking of testimony at the scene of the accident. There was no error in regard to the contentions numbered (1), (2) and (3), and we have no

doubt that if present counsel feels that the plea of insanity should be reinstated, the lower court, upon proper motion, will give proper consideration thereto. Any error which may have been inherent in either of the contentions numbered (4) and (5) appears to have been both invited and waived.

The judgment and order are reversed, and the cause remanded for a new trial.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., and White, J., concurred.

Respondent's petition for a rehearing was denied September 26, 1962.