[Crim. Nos. 7356, 7513.   In Bank.   Mar. 31, 1964.]

THE  PEOPLE,  Plaintiff  and  Respondent,  v.  RONALD
  HOWARD  POLK,  GEORGE  ANTHONY  GREGG,  and
  AVERY  MATTHEWS, Defendants and Appellants.

Claude O. Allen, Irving C. Sugarman and Ransome M. Smith, under appointment by the Supreme Court, for Defendants and Appellants.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

THE COURT.—By jury verdicts defendants Polk, Gregg, and Matthews were found guilty of conspiracy to kidnap for the purpose of robbery, and Polk and Gregg were found guilty of first degree murder. On the latter count the jury fixed the penalty at death, and judgments were entered accordingly.[1] The appeals of Polk and Gregg are automatic (Pen. Code, § 1239, subd. (b)) ; that of Matthews is by notice duly filed.

By amended indictment defendants Polk, Gregg and

---

[1] On the conspiracy count all three defendants were sentenced to state prison for the term prescribed by law. (Pen. Code, §§ 182, 209.)

Matthews, and one Jack Blonde, were charged in Count I with conspiring together on or about March 31, 1962, to kidnap for the purpose of robbery. As a first overt act it was alleged that defendants robbed William Fambro of a billfold on or about March 31, 1962; as a second overt act it was alleged that defendants and Blonde robbed Neil Schill of a billfold on or about May 18, 1962.

Count II of the indictment charged defendants with kidnaping Fambro for the purpose of robbery, and that the victim suffered bodily harm. Count III charged defendants with murdering Fambro. Count IV charged Matthews and Blonde with kidnaping Schill for the purpose of robbery, and that the victim suffered bodily harm.

Defendants' motions to set aside the indictment (Pen. Code, § 995) were denied, and each entered a plea of not guilty. Before the defendants had "gone into their defense" the indictment as against Blonde[2] was dismissed pursuant to Penal Code section 1099, and he became a witness for the prosecution. Prior to empaneling the jury Counts II and IV of the indictment were dismissed as to all defendants therein charged on motion of the district attorney (Pen. Code, § 1385), and on the 13th day of trial the murder charge as against Matthews was dismissed.

On the remaining counts the jury found the defendants guilty as charged, determined the offense in Count III to be murder in the first degree, and fixed the penalty therefor at death. Motions by Polk and Gregg for new trial or for reduction of the penalty were heard and denied.

The evidence establishes the perpetration of a series of brutal crimes—kidnapings, assaults with a deadly weapon, armed robberies, and murder with mutilation of the victim—committed in concert by these defendants insofar as each has been found guilty of the respective charges. A résumé of the evidence follows:

Allen Cade testified that he first met the defendants in November 1961 and saw them occasionally thereafter. On the evening of March 30 or 31, 1962, Cade entered a restaurant in Los Angeles called the Dairy Lunch and saw Polk, Gregg and Matthews sitting at the tables. Polk approached him and asked to borrow 50 cents, then said, "I'm going to make me some money." When Cade inquired how he was going to do so, Polk said, "I got the stuff" and lifted up his shirt,

---

[2]In another proceeding Blonde had pleaded guilty to the robbery of Schill.

revealing a revolver thrust under his belt. Gregg came up and repeated, "We going to get us some money." When Cade next saw Gregg, on the second morning following this conversation, Gregg was wearing a white sailor's hat.

During the last part of March 1962 William Fambro, a 20-year-old sailor, had been on leave with his family in Norwalk, California. He was to report to his ship in Bremerton, Washington, on the morning of April 1 or 2. At about 9 p.m. on March 30 his wife left him on Highway 99 beyond San Fernando, where he hoped to catch a ride to his ship. Before leaving he ate a banana sandwich; he was in uniform, including a white sailor's hat, and had about $20 in his wallet.

At 5:45 p.m. on April 2 Fambro's body was discovered down an embankment off Highway 65 in Tulare County. Footprints and other evidence at the scene indicated that two persons had carried the body to the shoulder of the road and thrown it over the embankment. Fambro's wallet was missing, as was his white sailor's hat.

A post mortem examination showed the cause of death to be three bullet wounds, including one inflicted by a bullet passing through the heart. The pathologist testified that a person receiving the type of wounds sustained by Fambro would not die instantly but might live for several minutes. The bullet holes in the victim's jacket showed powder burns from the muzzle of the weapon; the path of the bullets through the body indicated that all three shots were fired from the same angle. At the time of the examination Fambro had been dead between 48 and 72 hours, and, based on the partially digested condition of the bananas in his stomach, it was the opinion of the pathologist that he had been killed no more than three or four hours after eating them.

The fly of Fambro's trousers had been ripped open and several buttons torn. The victim's penis was missing, having been "rather crudely amputated," leaving a "ragged" wound. From the condition of the body, including the amount of blood found in the pubic area and on the victim's shorts, the pathologist concluded that Fambro had been alive at the time his penis was amputated in such a manner.

Jack Blonde testified that on the evening of May 15 or 16 he met Polk, Gregg and Matthews in the Dairy Lunch. They drove around in a 1953 Mercury, saw a drunk and decided to rob him. Matthews parked the car, Blonde threw the victim to the ground, and Polk "stomped" him by jumping on his chest with both feet. They took his wallet and watch and

drove away. Thereafter they attempted to obtain a gun but were unsuccessful. The following night the four of them went walking, "looking for another person to rob." Polk and Gregg walked on one side of the street, Matthews and Blonde on the other. Blonde spotted a 1962 Pontiac station wagon following them, and Matthews told him to "act like a queen" (i.e., the "female" partner in a male homosexual relationship). The witness explained that this meant to walk "swishing" one's buttocks from side to side. The driver of the station wagon, a Mr. Delaney, stopped and picked up Blonde and Matthews. As they entered the car Blonde motioned for Polk and Gregg to follow, but the latter were unable to do so. After driving around in a pretended search for benzedrine, Matthews threw pepper in Delaney's eyes, and Blonde stabbed him four times in the chest. Delaney escaped from the car, but Matthews and Blonde chased him, knocked him down, kicked him several times, and tore his clothes looking for money. They then took his station wagon, returned to the Dairy Lunch and picked up Polk and Gregg, and stole a set of paper license plates for the car. Taking Johnny Keyes with them, the five set out for San Francisco with Matthews driving. First they saw an old man with a cane, and selected him as a victim. Blonde, Polk and Matthews, the latter carrying an iron bar, got out of the car. Polk and Matthews grabbed the old man, the cane and iron bar flew through the air, and the man fell to the ground. The assailants ran back to the car with the victim's wallet and drove on.

Neil Schill, a paratrooper who was the victim of the kidnaping and robbery charged as the second overt act in Count I (conspiracy), testified that after midnight on the morning of May 17, 1962, he was hitchhiking on Highway 99 just north of Bakersfield when he was picked up by a new Pontiac station wagon. On entering the car he first saw only three people, two in the front and one in the middle seat; the driver appeared to be a woman, was wearing a woman's sweater, and was referred to as "her" by the others. After he got in, Schill heard someone stirring behind him and saw two men in the back seat. A few minutes later they pulled into a gas station to have the car's radiator serviced, and all but Schill went into an adjoining restaurant. Schill, who had not slept for two days, remained in the car and tried to sleep. In the restaurant it was decided to rob Schill, and Matthews emptied the pepper from a shaker on the table, rolled it in a napkin and put it in his pocket. On returning to the car

Matthews and Polk entered the front seat, Gregg and Blonde entered the middle seat on either side of Schill, and Keyes got in the back.

Schill testified that shortly thereafter "we were driving along about eighty miles an hour and the woman—Matthews—said, 'Neil, do you know what you can do for me?' And I said, 'No, what?' And he said, 'Well, you can start by taking all your clothes off.' And I said, 'Are you serious?' And at this time Blonde pulled a knife and held it in front of my face and said, 'Yes, she is serious, or else I'm going to cut you up.' " Schill grabbed the blade and twisted it away from Blonde; as he turned to do so, Gregg reached into Schill's back pocket and took his wallet. Then, as Schill described it, "everyone started to swing at me and kick at me, and I believe Polk had taken some pepper out of the glove compartment and rubbed it in my eyes." Matthews finally brought the car to a stop, and everyone except Schill scrambled out and took positions around the outside of the car, trying to keep all the doors shut but one. Matthews stood at the open door with a beer bottle in his hand, saying, "get the lead pipe." As Schill got out Matthews said to him, "Take your clothes off or else I'm going to smash you in the face." Schill lunged forward and Matthews hit him in the face with the bottle, breaking off a tooth and badly cutting his mouth. When Schill tried to get up Matthews kicked his feet out from under him. But Schill, bleeding heavily, managed to run across the highway and escape by flagging down a passing car.

Blonde testified that the five continued driving to San Francisco, having divided among them the contents of Schill's wallet and duffel bag. Keyes left the party in San Francisco, and the remaining four drove around the city "looking for somebody to rob." They saw a Mexican walking along the sidewalk and pulled him into the car. As they continued driving they robbed him of his watch and a ring, forced him to remove his clothes, and turned him out into the street naked except for his socks. They found no more victims to rob in San Francisco, although they were "hoping for another one." On their return trip to Los Angeles they picked up a hitchhiking sailor, turned off the highway onto a side road, and robbed him of his money and the contents of his duffel bag.[3]

[3]The fifth member of the gang, Keyes, pleaded guilty to being an accessory to the robbery of Schill. He testified for the prosecution, and

After arriving in Los Angeles Blonde and the three present defendants were arrested. A few days later all four made a joint statement to the police admitting the robbery of Delaney, the robbery of Schill, and the other robberies committed on their trip to San Francisco. The statement was tape-recorded and played to the jury.

Defendants and Blonde were also questioned regarding the robbery and murder of Fambro. In a series of statements all except Matthews admitted participating in these crimes. Each accused the others of actually pulling the trigger of the murder weapon and of amputating the victim's penis. Recordings of the statements were played or read to the jury. On June 3 Gregg took the police to the spot where Fambro was picked up outside of Bakersfield and pointed out the route taken to the approximate location where Fambro's body was found. On June 12 Gregg returned with the police to the murder scene and demonstrated how he and Polk threw Fambro's body over the embankment.

Each defendant took the witness stand and corroborated Schill's description of the crimes perpetrated against Schill[4] as well as Blonde's testimony concerning the other robberies on the trip to San Francisco.

As to the events surrounding the murder, Polk testified that he and Gregg met at a Los Angeles restaurant on the evening of March 30 or 31, and agreed that they needed money. Polk suggested that they "pull some jobs together"; Gregg asked, "What kind of jobs?" and Polk replied, "Service stations and liquor stores." Gregg agreed, and Polk went out and stole a car and obtained a gun from his apartment. As he drove away with Gregg he said that they were not going to pull any "jobs" around Los Angeles because it was "too hot" there but that they would head north to do so. Polk then testified that they "looked over a few places in San Fernando but the police was too hot out there"; that they then "cased out a few places in Bakersfield that we thought we could hit about closing time," but found no satisfactory victims; that they continued north on Highway 99 looking for something to "knock over" when they saw Fambro hitchhiking and stopped to pick him up. Polk's

his descriptions of the robbery of the old man with a cane and the robbery and kidnaping of Schill were materially identical with the testimony of Blonde and of Schill himself.

[4] In separate proceedings Polk and Gregg had each pleaded guilty to the robbery of Schill.

story was that Gregg and Fambro began arguing about how long it took Gregg to become a sergeant in the service; that Fambro then drew Polk into the argument and called him dirty names; that Polk stopped the car, began fighting with Fambro in the back seat, then pulled out his gun and shot Fambro three times. Polk further testified that as they were dragging Fambro out of the car Gregg took Fambro's wallet and amputated his penis.

Gregg testified that he and Polk were alone in the car when they saw Fambro, and that Polk said, "That's one we can get right there." Gregg further testified that there was no argument between them and Fambro but that after they turned off Highway 99 he demanded Fambro's wallet; that Fambro complied, and Polk then shot him without warning; and that Polk amputated Fambro's penis as they were dragging him from the car.

■ It is contended that in the *voir dire* examination of prospective jurors the district attorney committed prejudicial misconduct by expressing his "personal opinion," not based on the evidence, as to the proper penalty. It is apparent, however, that the prosecutor merely told the prospective jurors that, on the basis of what he anticipated the evidence yet to be presented would show, he expected to ask for the death penalty should the trial reach that stage. This was not improper. (*People* v. *Spencer,* 60 Cal.2d 64, 74-76 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Pike,* 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656].)

■ Complaint is also made of references in the district attorney's opening statement to the fact that Matthews was a homosexual. The point is without merit. The references were fully substantiated by the testimony of Cade, Schill, and others, and Matthews himself stated on the witness stand that he was a "queen." Such testimony was relevant to the issue of the acquaintance of the charged coconspirators with each other and the similarity of their modus operandi as evidence of a continuing conspiracy.

■ The principal assignments of error and misconduct advanced by all three defendants arise out of the dismissal of the murder count as to Matthews on the 13th day of trial, December 28, 1962. The district attorney stated in open court that Los Angeles County Jail records had recently come to his attention showing that Matthews had been incarcerated between March 20, 1962, and 4:45 p.m. on March 31, 1962. On that basis the district attorney declared that the prosecu-

tion entertained a reasonable doubt that Matthews was present at the time Fambro was killed, and accordingly moved to dismiss the murder count as to Matthews.[5] The court

[5]The relevant proceedings were as follows:

"The Court: I think we'll take an adjournment, but all the spectators in the back of the room will remain seated or where you are standing until the jury has left the courthouse and until you are excused by the officer in the rear.

"Mr. Ballantyne [the district attorney]: If the Court please, the People have a motion they would like to address to the Court at this time.

"The Court: Before we adjourn?

Mr. Ballantyne: Yes, Your Honor. May I make the motion now, your Honor.

"Mr. Bradley [counsel for Polk]: Is this something that can be made in the presence of the jury?

"Mr. Ballantyne: No, I want the jury to hear it, Counsel.

"The Court: Just a minute, Mr. Ballantyne.

"(Short off record discussion between Mr. Ballantyne and defense counsel.)

"Mr. Ballantyne: If the Court please, I stated on voir dire examination, I took an unequivocal position at that time as to the position of the People with reference to the defendants and my feeling that it was a capital case. I did state at that time, Your Honor, that certainly my mind remained open and the jurors should consider any new evidence that should come in. At the very beginning of this case, Your Honor, the first thing that they do is to check in Los Angeles when someone is picked up on a serious crime, to check the jail to ascertain whether or not any of the suspects were in custody at the time that the crime took place. This was done by Sergeant Brooks when he came into the case, and also by Lawrence John of the Tulare County Sheriff's office. Now, at that time they were informed by the Records Division of the jail that all of the defendants were clear as of the time that the crime occurred.

"The Court: By clear you mean they were not in jail?

"Mr. Ballantyne: They were not in jail, that's correct, Your Honor. And on the face of the record on Matthews appears the date 3/20/62. He was picked up on 3/20/62 on a masquerading charge, a disturbing the peace charge, and—or it was a masquerading charge. And apparently the clerk overlooked a part of the record at that time. Now, Sergeant Brooks—during the course of the trial I requested him to check his records on alibi and he was checking the field interrogation records on Christmas Day, and in doing so he noted again that the defendant Matthews had been in jail on 3/20 and he made a phone call to the jail to verify how many days he had been in jail. At that time he was informed that the defendant Matthews was actually released on 3/31/62. Now, at that time Sergeant Brooks immediately went to the Records office himself, thinking there was a mistake, and obtained the record. The record indicates, Your Honor, that Matthews was in jail from 3/20/62 until 3/31/62 at 4:45 P.M. in the afternoon. Now, Your Honor——

"The Court: There can be no mistake about the time?

"Mr. Ballantyne: There can be—there is the possibility always of a

granted the motion "in the interests of justice." A motion for mistrial by all three defendants was thereafter argued in the absence of the jury and denied.

Gregg points out that he had begun to testify before the dismissal of Count III as to Matthews took place, and contends that such dismissal therefore violated Penal Code section 1099, which provides that "When two or more defendants are included in the same accusatory pleading, the court may, at any time before the defendants have gone into their defense, on the application of the prosecuting attorney, direct any defendant to be discharged, that he may be a witness for the people." That section, however, is not applicable here. The murder charge against Matthews was not dismissed to grant him immunity so that he might be a wit-

---

mistake, Your Honor. This is a routine, it is done almost by reflex when the man is released from jail. It bears the stamp, it's a time stamp when the man is bailed out.

"Mr. Price [counsel for Matthews]: I made a similar inquiry just last night on the phone and there has been some partial verification but we hadn't been able to get the record yet because of the necessary steps.

"Mr. Ballantyne: Now, Your Honor, this was brought to my attention immediately by Officer Brooks, and I want to state that I think in the finest traditions of law enforcement this was called to my attention by this very fine officer. This was called to my attention at 10:00 o'clock on the 25th of December. The next morning I immediately called this to the attention of the Court, as the Court knows, and I stated my intention, that I intended to bring this out before the matter was submitted to the jury. I think it's the most important function of law enforcement and the District Attorney's office to, first of all, protect the innocent. Now, at this time, Your Honor, there is a reasonable doubt in my mind that the defendant Matthews was present at the time Fambro was killed. And I'm not predicating that statement upon the statement of this witness—I have some serious reservations about that.

"Mr. Bradley: If the Court please, I am going to object to that.

"Mr. Ballantyne: I withdraw that statement.

"The Court: The jury is admonished to disregard the last statement made by the District Attorney.

"Mr. Bradley: If he wants to make his motion I feel he should, but I don't think he should try to argue the case.

"Mr. Ballantyne: Yes. Counsel, I wanted to make my case clear on that. There is no reflection on the witness. I am not predicating my position, Your Honor, on the testimony of this witness, I am predicating it upon the document which is documentary proof; it satisfies the People that there is a reasonable doubt as to the complicity of Matthews in the Fambro murder. So at this time I would like to offer this record in evidence and predicated upon this record, Your Honor, I would like to move for the dismissal of Avery Matthews of Count III of the indictment, which involves the murder of Fambro, in the furtherance of justice."

ness for the People (Pen. Code, § 1099); Matthews was never called as such a witness. Rather, the charge was expressly dismissed "in the interests of justice," i.e., under Penal Code section 1385, which provides that "The court may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes." A motion under this section is not subject to the limitation that it must be made before the defendants have gone into their defense.

Polk and Gregg contend that it was prejudicial misconduct for the district attorney to make his motion to dismiss in the presence of the jury and to accompany it with the remarks quoted above (*ante*, fn. 5). They argue that the district attorney in effect expressed personal belief in their guilt of murder, since they were the sole remaining defendants charged with that crime.

The record refutes this contention. At the outset of their investigation the police had been informed by the Records Division of the Los Angeles County Jail that none of these defendants had been in custody at the time of the murder. Nevertheless, during the course of the trial the district attorney requested Officer Brooks to recheck the relevant jail records. The officer did so and discovered that according to a time stamp on the records of the Los Angeles County Jail Matthews had been in custody until 4:45 p.m. on March 31, 1962. This jail record appears to have been as much a surprise to Matthews' counsel as to the district attorney, for counsel told the court that he had just "made a similar inquiry" and "there has been some partial verification" of the fact. The dilemma then facing the district attorney may easily be seen: much of the evidence that he had amassed prior to trial tended to establish the presence of Matthews at the scene of the murder. Moreover, the jail record was not conclusive proof of Matthews' innocence. Not only was there the possibility of mistake in the routine use of the time stamp on jail releases (as the district attorney stated to the court), but under the medical evidence it was possible that the murder had occurred after 4:45 p.m. on March 31.[6]

---

[6]In support of the latter possibility defendants introduced evidence showing that Fambro's watch was running when it was removed from the body at the post mortem examination, and that it then indicated the correct time (9:50 p.m. on April 2, 1962); that the watch did not run down until 7:53 a.m. on April 3; and that it had a 48-hour period of operation.

The meaning and relevance of the discovery of the jail record were therefore not so obvious at the time as defendants would now have us believe. It was not unreasonable for the district attorney, having promptly informed the court of the discovery, to continue to present his case and to await further evidential developments. When, however, Gregg subsequently took the stand and gave testimony in complete accord with the jail record, disclaiming Matthews' presence at the murder scene, it was not unreasonable for the district attorney to conclude that an appropriate case had arisen for a motion to dismiss under Penal Code section 1385. Although the proof of Matthews' innocence is not conclusive, the evidence is sufficient to raise a reasonable doubt as to his complicity in the murder. It was therefore proper for the district attorney to move for a dismissal.

The motion was not the equivalent of an expression by the district attorney of personal belief in Polk's and Gregg's guilt of murder. The record shows that the district attorney's statements were based upon his analysis of the evidence. As the trial court observed in denying defendants' motion for mistrial, it was proper for the jury to know of the dismissal and the reason therefor. (See *People* v. *Frahm*, 107 Cal.App. 253, 262 [290 P. 678].) In the preceding 12 days of trial the jurors had heard a significant amount of testimony linking Matthews to the murder; due regard for the orderliness of their subsequent deliberations required their being informed as to the dismissal of the murder count against him. Polk and Gregg complain, however, that the motion to dismiss should not have been made in the presence of the jury. It would have been better practice had the motion been made and ruled on in the absence of the jury, and such a course should be followed if the situation again presents itself. (*People* v. *Alverson*, 60 Cal.2d 803, 807 [36 Cal.Rptr. 479, 388 P.2d 711].) In the present case the sequence of events was a novel one. When the district attorney undertook to make his motion in the presence of the jury there was no formal objection or opposition by counsel for defendants.[7] There is no showing of bad faith on the part of the prosecutor. In the circumstances no prejudicial misconduct appears.[8]

---

[7] Indeed, after the court admonished the jury to disregard the district attorney's remark as to the credibility of Gregg, counsel for Polk said, "*If he wants to make his motion I feel he should*, but I don't think he should try to argue the case." (Italics added.)

[8] For similar reasons there is no merit in Matthews' argument that by dismissing the murder count against him the district attorney in effect expressed personal belief in his guilt on the remaining count, conspiracy.

■ Matthews contends that after the dismissal the trial court abused its discretion in failing to declare a mistrial as to him on the ground that it was improper to proceed with a joint trial of all defendants on the conspiracy count and of only Polk and Gregg on the murder count. In support, it is argued that as an original matter it would have been improper to undertake a joint trial of such defendants on such counts. That premise, however, is untenable. Section 954 of the Penal Code permits joinder of "two or more different offenses connected together in their commission," and such joinder is allowable even though the offenses charged "do not relate to the same transaction and were committed at different times and places and against different victims, where there is a common element of substantial importance in their commission." (*People* v. *Chessman,* 52 Cal.2d 467, 492 [341 P.2d 679], and cases there cited; accord, *People* v. *Pike, supra,* 58 Cal.2d 70, 84; *People* v. *Kemp,* 55 Cal.2d 458, 475 [11 Cal.Rptr. 361, 359 P.2d 913].)

Here a common element of substantial importance clearly appears, as the robbery-murder charged in Count III was the first overt act of the conspiracy charged in Count I. Moreover, there can be no doubt that Matthews was properly charged as a joint defendant with Polk and Gregg in Count I, under Penal Code section 1098 which provides: "When two or more defendants are jointly charged with any public offense, ... they must be tried jointly, unless the court order separate trials." Accordingly, even if Matthews had not been charged on the murder count as an original matter, that fact would not have rendered the joinder improper or deprive the court of discretion to deny a motion for severance since there were a joint charge as to the conspiracy and a common element of substantial importance in the commission of all the crimes. (*People* v. *Chapman,* 52 Cal.2d 95, 97 [338 P.2d 428], and cases there cited; accord, *People* v. *Pike, supra,* 58 Cal.2d 70, 85.) Throughout the proceedings the court took pains to keep the jury instructed as to which evidence was limited to which defendant; and on the conspiracy count, of course, the jury was specifically instructed to disregard as to Matthews the allegations of the first overt act (robbery of Fambro). No abuse of discretion is shown in the denial of Matthews' motion for mistrial.

■ Matthews complains that earlier in the trial the court allowed into evidence against him the transcript of a statement given by Polk to the police implicating Matthews in the murder of Fambro and the various robberies committed on

the trip to San Francisco between May 17 and May 19, 1962. Matthews concedes that he was present when this statement was made, but argues that he was not afforded an opportunity to deny the accusations against him. (Cf. *People* v. *Briggs*, 58 Cal.2d 385, 407-409 [24 Cal.Rptr. 417, 374 P.2d 257].) The argument lacks factual support. The record shows that on this issue the officer taking the statement testified as follows: ''Q.[by the district attorney] Now, when Matthews was brought into the room at the time of the confrontation and the accusation by Mr. Polk, was he told at that time he could not make denials? A. No, sir, he was not.'' Matthews now argues that he was not ''allowed'' to interrupt. However, prior to putting it before the jury the court listened to a tape recording of the statement and read the transcript thereof. The district attorney pointed out that after the accusations were concluded, approximately half a minute elapsed (before Mathews was returned to his cell) during which time he made no denials whatever; and that on the occasion of a joint statement taken a month earlier (a tape recording of which had also been played to the court) Matthews had shown repeatedly that he was not in the least afraid to interrupt and criticize statements of a codefendant.

In these premises the court did not err in allowing the subject evidence to go to the jury for their consideration. (See *People* v. *Davis*, 43 Cal.2d 661, 670 [276 P.2d 801], cert. den. 349 U.S. 905 [75 S.Ct. 581, 99 L.Ed. 1241]; *People* v. *Yeager*, 194 Cal. 452, 486 [229 P. 40]; Code Civ. Proc., § 1870, subd. 3.) At the time of ruling, the court instructed the jury on the factual elements necessary to constitute an implied admission, and correctly admonished them that ''If, however, in weighing the conduct or the answer or lack of answer, if you weigh that and find it doesn't really constitute an implied admission of guilt, then, of course, you disregard the accusation, and you would, of course, also disregard the answer or conduct in relation to the accusation.'' This admonition was repeated by the court after the reading of the transcript to the jury, and a formal instruction to the same effect was later given.

■ It is asserted that the evidence does not support the jury's finding of a continuing conspiracy among all the named defendants. The record refutes this contention. It was the People's theory, after discovery of the jail records showing that Matthews was incarcerated until 4:45 p.m. on March 31, that on the evening of March 30 Polk and Gregg con-

spired to commit kidnapings for the purpose of robbery; that the robbery of Fambro was an overt act in furtherance of that conspiracy; that on or about May 15 Matthews and Blonde joined the conspiracy; and that the robbery of Schill was another overt act in furtherance of the same conspiracy.

It is unnecessary to repeat here all the evidence set forth above which supports that theory and from which the jury could properly infer the existence of such a continuing conspiracy between these defendants; it will be enough to refer to some of the more salient points of that evidence. Polk himself testified to the discussion he had with Gregg at the Dairy Lunch on March 30 concerning their need for money and their agreement to "pull some jobs together" in areas other than Los Angeles.[9] Polk further described how they drove around San Fernando and Bakersfield looking for victims to rob. Gregg testified that on spotting Fambro hitchhiking on Highway 99 Polk said, "That's one we can get right there." Polk and Gregg met again at the Dairy Lunch on May 15 or 16 and further discussed their need for money, this time with Matthews, Blonde, and others. They agreed to drive around looking for a place to rob (as Polk and Gregg had done on March 30), and then robbed a drunk on the sidewalk. The following night Polk, Gregg, Matthews, and Blonde went "out looking for another person to rob." Matthews entered Delaney's station wagon, and Blonde motioned to Polk and Gregg to follow them. They all returned to the Dairy Lunch, and agreed to drive together towards San Francisco. In this connection Blonde testified: "Well, we discussed it before we left [for] Frisco, about picking up

---

[9]Polk stresses the fact that the witness Cade testified that Matthews was also present on this occasion and that the defendants were in the process of doping the coffee of a "queen" to obtain "her" car for the purpose of using it to commit robberies. Polk argues that this testimony was later shown to be erroneous by the introduction of the jail record relating to Matthews' incarceration on March 30 and that it was therefore prejudicial error not to strike all of Cade's testimony in this respect. However, Polk testified that Cade was present when he met with Gregg at the Dairy Lunch on or about March 30, and Matthews testified that Cade was present at a meeting of Polk, Gregg, Blonde, and himself at the Dairy Lunch on or about May 15 at which they were in the process of doping a "queen" to obtain "her" car for the purpose of committing robberies. The district attorney argued to the jury that in the eight or nine months between these events and the trial Cade had become confused and had consolidated the two occasions in his memory. The argument was a plausible one, and the apparent discrepancy as to dates went only to the weight of Cade's testimony.

hitchhikers. Q.What were you going to do? A. Rob them."
As noted all three defendants admitted the series of robberies committed by them on the San Francisco trip, in each of which the same modus operandi was used: the defendants spotted their victim while driving along, and stopped and picked him up; acting as a team, they then sat him between them rather than by the door, threatened him with bodily harm, and robbed him. The foregoing evidence amply supports the verdict on the conspiracy count.

During the penalty trial the People called to the stand a psychiatrist, Dr. Colett, who had conducted psychiatric examinations of Polk and Gregg after their arrest. Dr. Colett testified that each defendant committed his various crimes "for kicks" and for money; that neither defendant showed any signs of remorse, but was only concerned about what would happen to himself; that each was habitually anti-social in nature and unable to learn by experience. On the basis of her examination Dr. Colett concluded that each defendant was a severe sociopath whose chances of rehabilitation were "extremely improbable." It is argued that Dr. Colett's conclusion coincided with one of the ultimate facts in issue. Even assuming it did, an expert opinion is not inadmissible merely because it coincides with an ultimate issue of fact. (See e.g., *People* v. *Cole*, 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435], and cases there cited.)

We have concluded that prejudicial error occurred in the penalty trial. The prosecutor made an argument and the court gave an instruction similar to the ones which we condemned in *People* v. *Morse*, 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33].

The district attorney in his concluding argument to the jury stated, "Now, Mr. Donahue [attorney for Gregg] brought out the fact that under our system the Adult Authority, if you sentenced these men to life imprisonment has the power to parole, and you will be instructed that after 7 calendar years these men, if given a life sentence, could be placed back on the streets of our society. Now, I'm not saying that they would do this, it might be a few more years, but they could, and the Adult Authority are made up of political appointees, they administer to all of the prisons, these few men, to all of the prisons in the Department of Corrections in the State of California, thousands of cases, and, remember, they can make mistakes. They didn't sit through these proceedings and hear this evidence. It gets rather distant, the

farther you get from the situation, as to what happened to Mr. Fambro. Are they going to be terribly concerned about that incident 8 or 10 years from now? Are they going to take a chance and turn these men back on the streets? Now Dr. Colett says that they cannot be rehabilitated, she has told us that the best type of therapy known and used today is group therapy. Gregg can gravitate toward the strongest members of the group, and I submit that the strongest members in a group in a prison population are the toughest and most vicious; that Polk is an impulsive, sadistic type that can never change, but they can fool people and they might place them back on the street, and I tell you this: This is the responsibility of this jury and this cannot be passed on to anyone else to see that this does not happen, and that requires a punishment of finality in order to protect society, and that is the responsibility of this jury, because by giving a life sentence to these Defendants you indicate that you feel that they can be rehabilitated, and possibly the Adult Authority should take a chance.''

The court instructed the jury in part as follows: ''In making your determination as to the penalty to be imposed, you may, in exercising your discretion to choose between different punishments, consider as a possible consequence that the law of this State provides that a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that a prisoner serving a life sentence may be eligible for parole. A trial judge may also reduce the penalty from death to life imprisonment. ... You are instructed that a prisoner imprisoned under a life sentence, may be paroled after he has served seven calendar years.''

These errors must be deemed to be prejudicial. In the recent case of *People* v. *Hines, ante,* p. 164 [37 Cal.Rptr. 622, 390 P.2d 398], we clarified the tests for determining prejudicial error in the penalty trial. We said in *Hines,* ''Our sole inquiry here devolves into a determination of whether substantial error, that is, substantial deviation from the standards established in *Morse,* has occurred.'' *Ante,* at p. 170. The instructions and argument in the instant case, as in *Hines,* unquestionably constituted substantial deviation from the standards established in *Morse.* Thus, prejudicial error occurred in the penalty trial.

The judgments as to Polk and Gregg are reversed insofar as they relate to the penalty for first degree murder. In all

other respects the judgments as to Polk and Gregg are affirmed. The judgment as to Matthews is affirmed.

SCHAUER, J., Concurring and Dissenting,—Obedient to the mandate of article VI, section 4½, of the California Constitution I have made "an examination of the entire cause, including the evidence," and am of the opinion that it is not reasonably probable that a result more favorable to defendants Polk and Gregg would have been reached in the absence of error committed on the penalty phase.

Accordingly, on the record in this case, and for all the reasons explained and documented in my concurring and dissenting opinion in *People* v. *Hines* (1964) *ante,* p. 175 [37 Cal.Rptr. 622, 390 P.2d 398], I dissent from the judgment of reversal and would affirm in its entirety each of the judgments of the trial court.

McComb, J., concurred.

The petition of appellant Matthews for a rehearing was denied April 29, 1964.