Estate of Mary Detlefs Nilson, Deceased, Norma Nilson Briggs, Administratrix v. Commissioner.
Estate of Nilson v. Commissioner
Docket No. 5232-68.
United States Tax Court
T.C. Memo 1972-141; 1972 Tax Ct. Memo LEXIS 115; 31 T.C.M. (CCH) 708; T.C.M. (RIA) 72141; June 29, 1972, Filed Russell E. Parsons and Michael K. Lanning for the petitioner. Norman H. McNeil, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: Respondent determined a deficiency in Federal estate tax against the estate of the decedent in the amount of $188,169.83. The only issue presented for decision is whether the estate is entitled to a claimed deduction of $381,000 as a claim against the estate, under section 2053(a)(3) of the Internal Revenue Code *116 of 1954. The claimed 709 deduction arose from the settlement of a lawsuit based upon a claim against the estate predicated upon decedent's alleged liability for a tort. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference. The decedent, Mary Detlefs Nilson, a widow, died intestate a resident of the State of California on July 25, 1964. Norma Nilson Briggs is the daughter of decedent and duly appointed administratrix of the decedent's estate. On the date of the filing of the petition in this case, the legal address of the estate was in Studio City, California. Petitioner's Federal estate tax return was filed with the District Director of Internal Revenue at Los Angeles, California. John Robert Briggs (hereinafter "Robert") and Norma Nilson Briggs (hereinafter "Norma") were married in 1950 and had three sons. At the time of Norma's marriage to Robert in 1950, Norma and her mother were beneficiaries of a considerable fortune generated by Norma's father and passed on to Norma and her mother as heirs upon his death. Norma's mother was apparently opposed to Norma's marriage *117 to Robert from the outset, and apparently attempted to appropriate all of Norma's attention. Robert had little financial support to contribute to the marriage. However, with the assistance of Norma's financial resources, he engaged in the business of real estate development. On July 19, 1959, Mrs. Nilson was the overnight guest of Norma and Robert. On the morning of the next day, July 20, 1959, Robert, Norma, and Mrs. Nilson got into an automobile, driven by Robert, to take Mrs. Nilson back to her home. Enroute, Robert stopped to fill the automobile's gas tank and a five-gallon can with gasoline. Robert then proceeded to drive into the Santa Monica hills, rather than directly toward Mrs. Nilson's home. At a point alongside a canyon, Robert stopped the car, engaged the parking brake, but left the automatic transmission in "drive" and the motor running. He stated that the motor was overheating, released the hood, and left the car with the women seated in the front seat. After examining the motor, he returned to the door nearest to the driver's side, whereupon the car started moving forward and went over the cliff into the canyon for a distance of 50 or 60 feet where it temporarily *118 came to rest on a small ledge. Norma and Mrs. Nilson were able to extricate themselves before the car tumbled to the floor of the canyon. Thereafter, with Mrs. Nilson as the complaining witness, Robert was charged with attempting to kill Norma and Mrs. Nilson. The theory of the prosecution was that Robert, deliberately and with intent to kill the women, caused the car to run over the cliff. Robert pleaded not guilty to the charges on the ground that the occurrence was an accident. He also pleaded not guilty on the ground of insanity. Mrs. Nilson was the chief prosecution witness. However, Norma testified in behalf of Robert. In January 1960, a jury returned a verdict of guilty. Thereafter, Robert abandoned his plea of not guilty by reason of insanity and appealed the judgment of conviction. The judgment was affirmed on February 26, 1962, by the California District Court of Appeal ( People v. Briggs, 19 Cal. Rptr. 772(. Robert then took the case to the California Supreme Court. On September 26, 1962, that Court reversed the judgment of conviction and remanded the case for a new trial ( People v. Briggs, 58 C. 2d 385, 374 P. 2d 257). The basis for reversal *119 by the California Supreme Court was prejudicial error arising from the trial court's admission of certain accusatory statements by Mrs. Nilson and the arresting officers at the scene. The court stated that the evidence was sufficient to sustain the guilty verdict, if the jury believed, as it did, the testimony of Mrs. Nilson for the prosecution and rejected the testimony of Robert and Norma for the defense. However, the court stated in its opinion: "From this review of the evidence, it is our conclusion that although it is sufficient to sustain the two jury verdicts [guilty on each count of attempted murder of Mrs. Nilson and Norma], it is so close (without consideration of the diary), that any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial." The diary mentioned by the court was a diary kept by Mrs. Nilson which had been marked for identification but had not been received into evidence at the trial, and thus had not been considered by the jury. The court pointed out that the diary was full of expressions of hatred for her son-in-law, that it showed a positive motive for obtaining Briggs's conviction, contained *120 material 710 which cast grave doubt on the credibility and mental condition of the prosecutor's chief witness, and would have added to the great weight of material which tended to bolster the defense witnesses. It further pointed out that the diary would be available for impeachment purposes at a new trial. Within a few months of the reversal of the judgment of conviction, in about January 1963, Mrs. Nilson became ill and was unable to testify for the prosecution. On April 20, 1964, the District Attorney dismissed the criminal charges against Robert. Thereafter, on July 25, 1964, Mrs. Nilson died. While the marriage of Norma and Robert was hectic and discordant, they lived together under the same roof except for a period of seven months in 1960 during Robert's trial and the prosecution of his appeal, when he was incarcerated in the county jail. Besides being a key witness for the defense, Norma borrowed in excess of $200,000 from E. F. Hutton & Company, in Los Angeles; and from the proceeds of the loan, secured by a pledge of her own property, she paid all the costs of Robert's defense of the criminal charges. Norma was the sole surviving heir of her mother. Under the law *121 of California, title to her mother's estate passed to Norma, subject to creditors' claims, as of the date of death. The gross estate was approximately $2,900,000. Robert had conversation with Norma after Mrs. Nilson's death, during which he threatened to file a claim against the estate based upon malicious prosecution by the decedent of the criminal case. Robert was of the opinion at that time that whatever the amount of his claims, such amount would be a legitimate deduction for Federal estate tax purposes and that Norma could not dispute its merits. On February 15, 1965, Robert filed with the clerk of the probate court, a creditor's claim for $1,500,000 which included punitive damages of $500,000,, against Mrs. Nilson's estate. For several years prior to 1965, Robert and Norma had been clients of Michael K. Lanning, an attorney at law. After Mrs. Nilson's death, Lanning was engaged as attorney for the estate, and at a point in time when Norma determined that Robert might actually press a claim against the estate for malicious prosecution, she consulted Lanning relative to the merits of the claim and Robert's contention about possible estate tax benefits. On or about February 15, 1965, Lanning *122 referred the problem to Charles H. Manaugh, an attorney at law who maintained his office near Lanning. Manaugh was also a certified public accountant and advised clients with respect to tax problems. Both lawyers advised Norma to reject Robert's claim, and on February 18, 1965, Norma as administratrix of her mother's estate, notified Robert that his claim was rejected in its entirety. On April 12, 1965, Robert filed a complaint for malicious prosecution in the Superior Court of the State of California for the County of Los Angeles against Norma, as administratrix of her mother's estate, and ten other unnamed defendants (Doe's I to X), alleging generally that Mrs. Nilson, individually, and in concert with the other defendants, maliciously and without probable cause had instituted the criminal proceedings against him. The complaint was filed by Robert in propria persona. While claim was made for general, special, and punitive damages, no amounts were alleged. Lanning and Manaugh, as counsel in charge of the defense of the malicious prosecution suit, forthwith initiated discovery proceedings, consisting of written interrogatories and requests for admissions of facts directed to Robert. *123 Thereafter, on May 28, 1965, Manaugh and Lanning, as counsel for the estate, filed a demurer to Robert's complaint for malicious prosecution. The demurrer specifically alleged that Robert's complaint did not state a cause of action, and that it lacked specificity in several respects, including the amount of damages sustained. In an accompanying memorandum of points and authorities, it was stated that punitive damages are not recoverable against an estate and that Robert's prior conviction was conclusive evidence of probable cause, absent fraud, and a bar to Robert's action for malicious prosecution. At the argument on the demurrer, the Judge indicated that he believed that Robert had stated a cause of action. In ruling on the demurrer, the Judge struck those paragraphs of the complaint which had been complained of for lack of specificity, with leave to Robert to amend; he struck the provisions of the complaint praying for punitive damages; but he did not dismiss the complaint for 711 failure to state a cause of action, as the estate had prayed in the demurrer. Robert subsequently filed an amended complaint on July 7, 1965, alleging therein that his conviction had been obtained *124 by perjured testimony and that he had sustained general damages of $1,500,000. After the filing of Robert's complaint Manaugh and Lanning attempted to convince Robert that his claim should be abandoned because of the disruption it caused in the marital relationship with Norma and because, they stated, the claim did not have merit from a legal standpoint. However, Robert continued to press his claim and his contention that there would be tax savings for Norma. Robert avoided confrontation with Manaugh and Lanning, and he avoided replying to their interrogatories and requests for admissions. He also engaged his own counsel. Manaugh proceeded with further discovery in an extensive deposition of Robert extending over a four-day period that began on Friday, June 18, 1965. At the noon hour recess on that day, Robert was served with a complaint for divorce by Norma, to which Robert filed an answer and a cross-complaint for divorce on July 5. The above-mentioned discovery deposition was concluded on June 25. As a result of that deposition and of the California court's action in ruling on the demurrer, Manaugh became convinced that Robert's case had merit. On July 12, 1965, Manaugh had *125 a conference with Norma, and he advised her to settle with Robert for an amount less than $500,000. Manaugh pointed out that there were no witnesses which he could call in defense; that in view of the Judge's ruling on the demurrer the case would likely go to the jury; that Robert could be an effective witness before a jury; and that the estate was highly solvent with over $2,000,000 of assets. Manaugh instructed Norma to herself conduct settlement negotiations with Robert because after the vigorous examination in the deposition Robert was bitter and hostile toward him. On the same date of July 12, in response to a telephone call from Robert, Norma invited him to her residence (they [were] living apart, at least since the filing of Norma's divorce complaint) to discuss settlement. At the meeting, Robert insisted on $1,000,000 which was rejected by Norma. On the next day, Robert and Norma again discussed settlement and he lowered his offer to $500,000, which Norma also rejected. After discussions, Robert further lowered his demand to $400,000, but Norma likewise rejected that figure. And on the succeeding day, July 14, bargaining at $1,000 at a time, Robert came down to $388,000. *126 Norma at that point contacted Manaugh, and upon advising him that that figure was the lowest to which she could bring Robert, she was told by Manaugh to agree to it. No specific items making up the oral settlement were discussed between Robert and Norma at that time. Within a few days after the foregoing oral agreement had been reached by and between Robert and Norma, Norma's counsel forwarded to Robert's counsel a draft compromise agreement relating to the tort action and a draft property settlement relating to the divorce action. The draft compromise agreement provided that Robert would dismiss his complaint in consideration of the payment to him of the sum of $388,000, to be paid by the estate in the form of transfers of four parcels of realty of an agreed value of $127,000 and cash in the amount of $261,000 in satisfaction of general damages and loss of earnings in the respective amounts of $370,152 and $17,848. The draft property settlement agreement provided, among other things, for a division of the community property between the spouses, that the tort settlement was to be Robert's separate property; and that Robert would pay the E. F. Hutton debt. On July 26, 1965, counsel *127 for Robert returned various settlement documents to Norma's counsel. The tort compromise agreement had been revised, increasing the settlement figure by $5,000 to $393,000 and concomitantly increasing the cash requirement from $261,000 to $266,000. The $393,000 was allocated, $363,608 to general damages, $17,667 for loss of earnings, and $11,725 for legal expenses incurred in defense of the criminal action. There was no mention of the E. F. Hutton debt in the proposal from Robert. Counsel for Norma promptly objected to Robert's revisions to the settlement and his pressure on Norma and their children, and threatened to proceed with litigation of both the tort and divorce cases unless Robert ceased such conduct. Thereafter, on August 14, 1965, upon arrangement by their counsel, Robert and Norma, individually and as executrix of the estate, with their respective counsel, met 712 in the office of counsel for Robert and executed a compromise and settlement agreement relating to the tort action and a property settlement agreement which settled their respective property rights and provided for withdrawal of their respective pleadings in the divorce action. In these final agreements, *128 the E. F. Hutton debt of $211,000, which Norma had contracted for the purposes above-mentioned and which Robert had repeatedly stated that he intended to pay, was taken out of the property settlement agreement where it had appeared as a debt of Norma to be paid by Robert, and was inserted in the tort compromise and settlement agreement. The settlement figure remained at $388,000, payable by the estate in the form of transfers of four parcels by the real estate of an agreed value of $127,000 and cash in the amount of $261,000. The estate was to pay the cash portion as follows: $211,000 direct to E. F. Hutton & Company, and $50,000 to Robert. On September 1, 1965, a petition for an order approving the settlement of Robert's claim was filed with the probate court. Thereafter on September 21, 1965, a 16-page document entitled "Declaration of Counsel in Support of Petition for Order Approving Compromise and Settlement," signed by Norma's counsel, was filed with the court. On September 29, 1965, the petition came on for hearing, at which time Norma's counsel were present and prepared to testify in support of the petition. The presiding judge briefly examined the file before him, and then, *129 without asking any questions of the witnesses who were present, stated: If the suit went to trial, I do not believe Briggs would obtain such a sum. I will approve it. I realize it's her money and her business if she wants to give it away, but I can't put my blessing on it. Thereafter, on October 6, 1965, the probate judge who had heard the matters on September 29, entered an order approving the compromise, which order was filed on October 7. In that order it was ordered that Norma, as administratrix, execute the requisite conveyances of the four parcels of real estate to Robert and pay to him $261,000 - $50,000 to him directly and $211,000 directly to E. F. Hutton & Company. Subsequently, E. F. Hutton & Company was paid by a check drawn on the estate's commercial bank account by Norma, as administratrix, in the amount of $211,000; an estate check in the amount of $50,000 was made payable to Robert; and property of a value of $127,000 was deeded over to him by Norma, as administratrix of the estate. On Schedule J of the estate tax return, a deduction was claimed in the amount of $381,000, described as "settlement of lawsuit against estate, amounts paid to Robert Briggs, plaintiff, *130 for full release of all claims against estate. [1]
The respondent, in his statutory notice of deficiency, denied the claimed deduction, stating that it was not allowable as a deduction under section 2053 of the Internal Revenue Code. Opinion Section 2053(a) of the Internal Revenue Code of 1954 provides that the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts for claims against the estate as are allowable by the laws of the jurisdiction under which the estate is being administered. The amount herein in question is the amount of $381,000, a portion of the amount of $388,000 paid by the estate in settlement of Robert's suit against the estate for malicious prosecution by the decedent. The respondent does not deny that a bona fide payment *131 in settlement of a tort claim against an estate is deductible in determining the value of the taxable estate. Indeed, section 20.2053-4 of the Estate Tax Regulations provides in part as follows: The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured * * *. Only claims enforceable against the decedent's estate may be deducted. * * * Liabilities imposed by law or arising out of torts are deductible. See Smith v. United States, (D. Mass.) 16 F. Supp. 397, affirmed per curiam on another issue (C.A. 1) 92 F. 2d 704. [2]
However, the respondent contends that the amount in question in the instant case 713 is not deductible. It is his position that Robert's claim was frivolous and that the inducement for compromise did not lie in a realistic appraisal of the defense to *132 his claim. Rather, it is his position that the inducement was to abate his continuing harassment and threats to his wife Norma, reconciliation between the spouses, and estate tax saving. It is further his position that the decree of the probate court approving the settlement of such claim was not based upon a consideration of the merits and is not binding on this Court, citing, among other things, section 20.2053-1(b)(2) of the Estate Tax Regulations. [3]
*133 From our appraisal of this record, we are not satisfied that the decree of the California probate court, pursuant to which the payments here involved were made, was entered after a consideration of the tort settlement on its merits. The document was prepared by counsel for the estate, and so far as the evidence in this record shows, the probate judge signed the order in accord with his prior remarks in open court. We accordingly agree with respondent that the decree of the probate court is not binding upon us. Wolfsen v. Smyth, (C.A. 9) 223 F. 2d 111; Smith v. United States, supra; see also Second National Bank of New Haven v. United States, 387 U.S. 456. We have, however, felt it proper to appraise the merits on our own, and having done so, we are satisfied, for reasons presently to be shown, that the payments to Robert represented payments in settlement of a bona fide claim against the estate, and as such are properly deductible for estate tax purposes. We cannot accept the respondent's argument that Robert's claim was frivolous in that he could *134 not make out a prima facie case or prove damages and that accordingly there was no bona fide or enforceable claim under local law. In this connection we note that the California judge who ruled on the estate's demurrer to Robert's original complaint was of the opinion that Robert had made out a cause of action and he refused to grant the prayer of the demurrer which sought dismissal on that ground. Counsel for the estate came to believe that too, and after an assessment of their litigating chances in the light of their total lack of defense witnesses (Mrs. Nilson was dead and Norma could hardly testify against Robert after having testified for him at his criminal trial), the potentially damaging effect of Mrs. Nilson's diary showing hatred of Robert, Robert's anticipated effectiveness as a witness before a jury and the equities with him (including seven months spent in jail), and the extensive assets in the estate, they concluded that the case had better be settled than taken to court. Respondent lays much stress on the remarks of the probate judge in open court on September 29, 1965, set out in the findings of fact. However, it is to be noted that the judge expressed doubt as to *135 the amount of damages which he thought Robert could have recovered at trial. He did not say that he did not believe that Robert had a cause of action, and the fact remains that he did enter a decree approving the settlement and authorizing the payment. No one, of course, will ever know what Robert would have received if the case had gone to trial. However, both of the counsel for the estate testified that they thought a good settlement had been made. The evidence clearly establishes that the amount of the settlement was fixed after vigorous arms' length bargaining and dickering between Norma and Robert. Under all the circumstances we accept the amount of the settlement as a reasonable one. Respondent's final argument is stated as follows: "The bases for compromise of the tort claim were tax saving, the need to placate Robert and reconciliation of Norma and Robert, none of which support a deduction for estate tax purposes." 714 From our consideration of the evidence, we reach a different conclusion. Testimony of Norma and the two counsel for the estate [refutes] the contention that the settlement was dictated by a tax saving motive. Robert presented this as a reason for paying *136 him off, but neither Norma nor her counsel ever gave their assent. Norma did not want to pay Robert anything, for placative purposes or otherwise, and consented to do so only upon the advice and recommendations of her counsel, after their appraisal of the hazards of litigation. We think that the settlement was entered into for the purposes of ridding the estate of what was believed to be a valid cause of action against it and thereby avoid troublesome, expensive, and potentially protracted litigation, and the possibility of a judgment against it of a greater amount. In his argument on this last point, respondent lays special stress on the $211,000 which was paid to E. F. Hutton & Company, and which respondent claims was shifted from the property settlement incident to the divorce, over to the compromise and settlement of the tort claim. As we view the record, there was no such shift. In the proposed property settlement, Robert undertook to pay off the moneys which Norma had borrowed to pay for his defense of the criminal action. Prior to the making of the property settlement, Robert and Norma had agreed on the $388,000 tort settlement, $261,000 of which was to be paid in cash. All *137 that was accomplished in the final tort settlement effected on August 14, 1965, was to earmark $211,000 of that cash settlement for payment to Hutton, and thereby assure Norma that Robert's undertaking to pay that debt would be carried out. We find in the settlement no cloak for a gift to Robert, and we accordingly hold that the petitioner-estate properly deducted the $381,000 as a claim against the estate. Decision will be entered under Rule 50. Footnotes
1. The stipulation of facts states that cash and property of the total value of $388,000 was paid to Robert. The record contains no explanation for the different amount of $381,000 claimed as a deduction in respect of payments made to him.↩
2. For a discussion of the deductibility of tort claims, see Lowndes and Kramer, Federal Estate and Gift Taxes (Second Edition, 1962), section 15.13.↩
3. Such section of the regulations provides as follows: (2) Effect of court decree. The decision of a local court as to the amount and allowability under local law of a claim on administrative expense will ordinarily be accepted if the court passes upon the facts upon which deductibility depends. If the court does not pass upon those facts, its decree will, of course, not be followed. For example, if the question before the court is whether a claim should be allowed, the decree allowing it will ordinarily be accepted as establishing the validity and amount of the claim. However, the decree will not necessarily be accepted even though it purports to decide the facts upon which deductibility depends. It must appear that the court actually passed upon the merits of the claim. This will be presumed in all cases of an active and genuine contest. If the result reached appears to be unreasonable, this is some evidence that there was not such a contest, but it may be rebutted by proof to the contrary. If the decree was rendered by consent, it will be accepted, provided the consent was a bona fide recognition of the validity of the claim (and not a mere cloak for a gift) and was accepted by the court as satisfactory evidence upon the merits. It will be presumed that the consent was of this character, and was so accepted if given by all parties having an interest adverse to the claimant. * * *↩